```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                    FORT LAUDERDALE DIVISION
                   CASE NO. 0:14-cv-62369-BB
 3


 4     ARCTIC CAT, INC.,

 5             Plaintiff,                    April 19, 2016
                                            1:04 p.m.
 6             vs.

 7     BOMBARDIER RECREATIONAL
       PRODUCTS, INC., BRP US, INC.
 8
               Defendants.                  Pages 1 THROUGH 69
 9     _____

10

11                 TRANSCRIPT OF MOTIONS HEARING
                 BEFORE THE HONORABLE BETH BLOOM
12                   UNITED STATES DISTRICT JUDGE

13

14     Appearances:

15     FOR THE PLAINTIFF:  HAGENS, BERMAN, SOBOL, SHAPIRO, LLP
                           NICHOLAS S. BOEBEL, ESQ.
16                         1918 Eight Avenue, Suite 3300
                           Seattle, Washington 98101
17

18                         KUTAK, ROCK, LLP
                           AARON A. MYERS, ESQ.
19                         220 South Sixth Street, Suite 1750
                           Minneapolis, Minnesota 55402
20

21                         HARKE, CLASBY & BUSHMAN, LLP
                           BARBARA LEWIS, ESQ.
22                         9699 Northeast 2nd Avenue
                           Miami Shores, Florida 33138
23

24

25
```

```
 1   FOR THE DEFENDANT:    DINSMORE & SHOHL, LLP
                           JOHN D. LUKEN, ESQ.
 2                         255 East Fifth Street, Suite 1900
                           Cincinnati, Ohio 45202
 3
                           RUMBERGER, KIRK & CALDWELL
 4                         SCOTT M. SARASON, ESQ.
                           80 Southwest 8th Street, Suite 3000
 5                         Miami, Florida 33130

 6
     COURT REPORTER:       Yvette Hernandez
 7                         U.S. District Court
                           299 East Broward Boulevard, Room 207-B
 8                         Fort Lauderdale, Florida 33301
                           yvette_hernandez@flsd.uscourts.gov
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1         (Call to order of the Court, 1:04 p.m.)

2              COURTROOM DEPUTY:  Calling Case Number 14-62369,

3    Civil, Arctic Cat, Inc. v. Bombardier Recreational Products, et

4    al.

5              Counsel, please state your appearances for the record.

6              MR. BOEBEL:  Good afternoon, Your Honor.  Nicholas

7    Boebel, from the Hagens Berman Law Firm, on behalf of the

8    Plaintiff, Arctic Cat.  And I'll allow my co-counsel to

9    introduce themselves.

10             MR. MYERS:  Good afternoon, Your Honor.  It's Aaron

11   Myers from the Kutak Rock Law Firm, for Plaintiff, Artic Cat,

12   Inc.

13             MS. LEWIS:  Good afternoon, Your Honor.  Barbara Lewis

14   from Harke, Clasby & Bushman, for Plaintiff.

15             THE COURT:  Good afternoon.

16             MR. SARASON:  Your Honor, good afternoon.  Scott

17   Sarason, from Rumberger, Kirk & Caldwell, on behalf of

18   Bombardier Recreational Products.

19             MR. LUKEN:  And John Luken, from Dinsmore & Shohl, for

20   the Defendants.

21             THE COURT:  All right.  Good afternoon to each of you.

22   I must say, you've been keeping me very busy lately.

23             Go ahead and have a seat.

24             And Mr. Luken and Mr. Sarason, I don't want you to

25   think for any reason that I've already predetermined what the
```

1  outcome of the Defendant's motion for summary judgment will be,

2  but I would like to first discuss an expedited briefing

3  schedule to properly prepare for what may be a trial on

4  May 16th.

5          I have received Docket Entry 107 and 108; 107 being

6  the Defendant's motion in limine; 108 the Plaintiff's motion in

7  limine.  And I would like to set an expedited briefing schedule

8  so that I can be prepared, as well as you, for a trial, if we

9  get to that point.

10          I would like the response to each of the motions to be

11  filed by April 26th and the reply by May 2nd, and I thank you.

12          I would also like to point out that many of the

13  filings have been through sealing.  And today, I'm not certain

14  if you're requesting that a portion of this transcript or the

15  transcript be sealed, but I did want to bring to your attention

16  that this will be a public record.

17          So we have 90 minutes together.  And due to that time

18  constraint -- it seems like a lot of time, but it is not -- I

19  would like to divide up the time with regard to the three

20  motions that we have, which are Docket Entry 75, the

21  Plaintiff's motion to strike the opinions of Dr. Ugone and

22  Mr. Taylor; Docket Entry 76, the Defendant's Daubert motion to

23  exclude the testimony from Dr. Cuzzillo, Paul Kamen, and Walter

24  Bractic, as a well as the Defendant's motion for summary

25  judgment.

```
 1            And might I suggest that we divide up the time in this

 2       manner, since the Defendant has two motions before the Court,

 3       the Plaintiff has one -- that perhaps, Mr. Luken and

 4       Mr. Sarason, that you can begin with 30 minutes.  Arctic Cat

 5       can respond for 30 minutes.  Then BRP can then rebut for 15,

 6       and Arctic Cat can then further rebut for 15.

 7            Does that sound fair?

 8            MR. LUKEN:  Yes, Your Honor.

 9            MR. BOEBEL:  Yes, Your Honor.

10            THE COURT:  Within the time that you have -- I don't

11       want to tell you how to present argument, but I would like to

12       share with you some areas of interest that I have.  And that

13       includes the -- obviously, the invalidity under Section 103,

14       and that relates to reconciling Mr. Breen's claim as to the

15       obviousness under Section 103; the issue of laches, and I would

16       like you to make argument first and foremost with regard to the

17       Supreme Court's case of Petrella v. -- the case that's now --

18       certiorari has been pending on the SCA Hygiene Products.

19            I would like you to touch upon the prejudice suffered

20       and whether the delay was reasonable in light of the evolution

21       of the BRP products.

22            And then finally with regard to the damages, I would

23       like you to discuss the argument of the failure to mark under

24       Section 287(a) and whether the compliance with that marking

25       statute is or is not a question of fact.
```

```
1              I believe that within those confines I'll hear
2    argument with regard to Dr. Cuzzillo, Mr. Taylor.  And
3    Dr. Cuzzillo will certainly dovetail into the issue of the
4    doctrine of equivalents.  And if you can address that, that
5    would be helpful.  Those are the areas that the Court is
6    wrestling with, quite candidly, in terms of these motions.
7              So whenever you're ready, Mr. Luken or Mr. Sarason.
8    I'm not sure who is going to be proceeding.
9              MR. LUKEN:  Your Honor, we have -- I can hand up --
10             THE COURT:  I have it -- what's easier for you?  I
11   have it right here on the screen, if it's easier, or you want
12   me to look at -- whatever is easiest.
13             MR. SARASON:  If I may approach?
14             THE COURT:  Sure.
15             MR. LUKEN:  Thank you, Your Honor.
16             The way we've organized it, the summary judgment
17   presentation is in one PowerPoint, the Daubert presentation is
18   in another.  And I sort of organized the Daubert presentation
19   not by who filed the motion, but by which expert.  So I put the
20   infringement people first and then I put the damages people
21   second.
22             And in light of your indication that we should go with
23   the half hour/half hour, I think I'll just -- there's more
24   slides in here than I'm going to use.
25             THE COURT:  Okay.
```

         1          MR. LUKEN:  But the Court will have them if the

         2    Court's interested.

         3          In most patent cases, when we get to this point, we

         4    start with non-infringement.  But this is an unusual case

         5    because we've lead in our motion with summary judgment, and I

         6    am glad Your Honor brought it up.  The slides mainly that I've

         7    got here are dealing with sort of merits arguments, but I'm

         8    going to talk about the KSR decision right up front.

         9          THE COURT:  Okay.

        10          MR. LUKEN:  So the major point is that the Rheault 938

        11    patent and its jet boat equivalent was actually sold in

        12    combination with a prior art PWC -- just a basic PWC from the

        13    time -- renders the claims obvious.  Our own experts were part

        14    of the Coast-Guard-funded study that whether one follows the

        15    teaching suggestion motivation test that predated KSR -- that

        16    was such a higher hurdle to get over -- or whether one follows

        17    the post-KSR obviousness test that the Supreme Court announced,

        18    I think this case meets both of them by miles, more so than KSR

        19    itself.

        20          Arctic Cat own's documents show that AC was aware of

        21    the very work that is the reason to combine here before the

        22    invention that lead to the patents, and multiple other

        23    individuals actually combined them or urged combining.  So we

        24    start with:  What is the rule under 103?  The statute's there.

        25    Your Honor has seen it.  Bonito Boats.  The Supreme Court

1    explains that it takes the 102 standard, which is where

2    basically you have to find prior art that if it was made today

3    would infringe, and it expands it to the range of that which

4    one skilled in the art would know to be obvious.

5            KSR v. Teleflex, the Supreme Court emphasizes:  "The

6    need for caution in granting a patent" -- which obviously that

7    case was enforcing a granted patent -- "based on the

8    combination of elements found in the prior art where the

9    combination of familiar elements, according to known methods,

10   is obvious when it does no more than yield predictable

11   results."

12           Your Honor -- and this is where I'm going to stray

13   from the script because I read KSR again last night, as I

14   should probably do more frequently in the line of business I'm

15   in.  But KSR has -- basically is very analogous to our case.

16   We have a throttle reapplication system, which meets the

17   throttle reapplication thrust, thrust control, steerable thrust

18   parts of all the claims, and it's applied to a personal

19   watercraft, and there's no magic about it.  The thrust control

20   system does what the 938 did all along, and the personal

21   watercraft does what it did all along.  They have merely been

22   put together.  That is KSR.  KSR has the gas pedal on a car,

23   and it has -- it is mounted in a certain way that it can pivot,

24   but it stays -- the pivot point stays put.  And it has a sensor

25   so that the connection to the engine is electronic, rather than

1    mechanical.  And that's the patent that's being enforced.

2            The prior art has a group of patents -- and one in

3    particular, Asano -- that has the pivoting adjustable so you

4    don't have to move the seat or sit on a telephone book.  It's

5    all right there.  And the rest of the issue is this electronic

6    sensor mounted on a fixed part that sends signals

7    electronically, and there are a number of patents that do that.

8    And General Motors, much like our jet boat, actually uses it.

9    The District Court property found that that was obvious under

10   130.  The Federal Circuit says:  "No, it's a harsher test than

11   that.  It's this teaching suggestion motivation," basically

12   saying one of those two references has to jump out and say:

13   "Combine me with the other reference," that it has to be that

14   blatant.  And the Supreme Court says:  "No.  It's much more

15   flexible," that when there's a limited number of options, and

16   it's obvious to try them, that's still obvious.

17           Even if the problem that the POSITA, the person of

18   ordinary skill in the art, would be trying to solve in this

19   hypothetical 130 situation isn't the same as the problem that

20   was in the patent that's at issue, it still is obvious.

21           So as we go through the rest of this, I invite Your

22   Honor to compare the facts here.  And on every pertinent issue

23   that Supreme Court faced in KSR, the facts are more compelling

24   in this case.

25           So we have Rheault 938, the Canadian patent

1    application, which publishes in 1998, more than a year before

2    the patent application.  It teaches a controlled thrust

3    steering system, providing a steerable thrust, as Your Honor

4    has construed those terms.  And those were both submitted by

5    stipulation of the parties.  It tells you that the nozzle may

6    be controlled by the vehicle's steering helm assembly, rotation

7    of the sheering wheel a given degree clockwise or

8    counterclockwise increases engine speed from about zero to

9    3,000 RPM.  So it has the throttle reapplication core of this

10   patent.

11          While Arctic Cat suggests that it was not automatic, I

12   think that's a misnomer.  Granted, on a jet boat, to put the

13   boat to idle, you have to do that manually.  But the key here

14   is:  Does thrust in the controlled thrust steering system get

15   applied automatically?  And it clearly was.  If the thrust is

16   idle, and you turn the wheel to full turn, you got thrust in

17   the 938.

18          Artic Cat suggests that the jet boat in particular,

19   and that Rheault generally was directed to low speed because it

20   was called docking assistance, and that's irrelevant.  First of

21   all, as I said a second ago, KSR says it doesn't matter what

22   the motivation is that leads you to combine.  You don't have to

23   be solving the same problem that the patent owner was.

24          More importantly, Rheault itself says explicitly:  "My

25   invention can be used on a personal watercraft."  And nothing

1    in Rheault or the jet boat prevents it from working at high

2    speed.  It may be intended for docking assistance primarily,

3    but it works at high speed, as the testing ultimately showed.

4            Moreover, KSR itself says:  "What matters is how broad

5    the claim is."  If they intended to make Rheault or any

6    low-speed prior art not affect their claims, they needed to

7    restrict the claims to high speed only.  And they didn't do

8    that.  The claims cover all speeds.  There are no restrictions

9    as to speed.  And therefore, the fact that the prior art --

10   even if the prior art were limited to low speed, it still fits

11   within the claims; therefore, it renders them obvious.  And the

12   Verdegaal Brothers case from the Federal Circuit makes that

13   abundantly clear.  It's very similar.  That wasn't operation of

14   a personal watercraft, but it was how fast one adds -- I think

15   it was sulfuric acid.  And the patent owner, like Arctic Cat,

16   said:  "Hey, in our invention, you're adding it quickly and

17   that distinguishes us from the prior art."  And the Federal

18   Circuit said:  "But your claims don't restrict how fast you add

19   it.  They cover fast and slow; therefore, the prior art renders

20   it obvious."

21           So as I said, Your Honor, the Challenger Jet Boat

22   actually put in practice and commercially sold the features,

23   and it has, under the title "Docking Assistance," the thrust

24   reapplication.

25           And now we're into the 103.  So we've got in effect --

```
 1    we've got the pedal that was the left half -- that patent that
 2    was that left half of KSR.  Now we're going to look at the
 3    sensor that mounts on it that was the right half of KSR.  And
 4    for us, that's a personal watercraft.  And Rheault specifically
 5    says:  "Use my invention on a personal watercraft."
 6             Frankly, Your Honor, I think that's enough that it
 7    implicitly discloses everything inherently, as they say in the
 8    patent cases.  And we could be making this a 102 motion, but
 9    103 is so much more clearer, we restricted it to the lower bar
10    of 103.
11             So by saying:  "Use my invention on a personal
12    watercraft, the steering mechanism of a personal watercraft to
13    the extent it's a handlebar on a post, as opposed to a steering
14    wheel on a post -- which we submit is a distinction without a
15    difference -- but to the extent that the personal watercraft
16    has one, when Rheault says:  "Use my invention on a personal
17    watercraft, a person of skill in the art knows that the
18    steering mechanism on a personal watercraft is the handlebar,
19    so Rheault has told him to use it.
20             Same thing for the throttle lever mounted on the
21    steering mechanism and bias towards idle.  The throttle is in a
22    different place on a personal watercraft than it is on the jet
23    boat.  And by inviting one to put the invention on a personal
24    watercraft -- Rheault has given teaching suggestion motivation
25    pre-KSR for doing that -- certainly makes it obvious to try.
```

```
1              And for example, personal watercraft of that time
2    period had handlebars, they had the steering mechanism, and
3    they had throttle levers biased to idle.  Even if Rheault did
4    not disclose, those other patents would be the right hand of
5    KSR.  That's where I think we're greater than or equal to KSR
6    because in KSR the Court just looked at the two patents and
7    said:  "One skilled in the art would know to put these
8    together.  They're just both doing what they do anyway.
9    They're just doing it at the same time."
10             In ours, we have those.  There are the personal
11   watercraft patents that we've cited here, like Boudriau.  But
12   KSR gives that explicit teaching to combine them that makes our
13   case stronger than in KSR.
14             Arctic Cat's brief in opposition primarily accuses us
15   of doing two things.  One is using hindsight, and the other is
16   sort of attacking us for what would be a 102 argument, not a
17   103.  The 102 argument really is irrelevant.  They point out
18   that -- and I think they quote Mr. Breen -- or -- yeah, the
19   interim report over and over and over again, how nobody's ever
20   commercialized this yet.  And while that is arguably a factor
21   in 102, frankly, if Mr. Spade had not passed away, and we could
22   establish that our Proto-14 was actually used publicly in a
23   public demonstration, we would have 102.  But I don't have that
24   witness, so I can't show it.
25             But for 103, it does not matter whether it was ever
```

1   fully commercialized.  I mean, that wasn't the case in KSR.

2   This patent -- the patent that was invalidated in KSR was the

3   first one to tie them up in a bow.  That doesn't preclude

4   obviousness.  If it did, there would be no 103.  There would

5   only be 102.

6        And the hindsight argument is equally irrelevant,

7   incorrect because here there is extensive documentation of

8   multiple sources either actually combining -- maybe not in a

9   commercially-sold manner -- or saying to.

10        And as the National Steel Car case says from the

11   Federal Circuit, the best evidence that it would be obvious to

12   combine two references to get the invention is the fact that

13   someone did it, and we have multiple people doing this.

14        So -- I'll go through this kind of quickly because

15   it's -- given the time constraints -- the Coast Guard funds a

16   study.  The Society of Automotive Engineers responds.  Our two

17   experts lead it, and they specifically test the Challenger Jet

18   Boat as an OTS solution.

19        Now, in the briefing here, we skipped most of the

20   discussion of the NTSB study.  But if Your Honor sees the

21   expert reports that their expert submitted, in order to jack up

22   the value of our patent, they talk how the NTSB during this

23   same time period was saying:  "You people in the industry need

24   to do something about off-throttle steering situations."  So

25   not only do we have the Coast Guard funding a study to look for

1    a solution to what this invention supposedly solved, but we

2    have the NTSB telling people to do it.  So there's ample

3    motivation to go out and do it.

4          Kevin Breen and Robert Taylor get the grant for Grant

5    18 with the SAE.  They hold a kickoff, in which they -- this

6    was not done in secret.  It is publically disseminated to

7    everyone.

8          Again, Arctic Cat had remarkably few documents by the

9    time we got the discovery in this case because of the passage

10   of time.  Most of what we had that was useful actually came

11   from Mr. Christopherson's own file, so there isn't a lot.  But

12   even from the deposition testimony of Mr. Christopherson, and

13   from his documents, it's clear that Arctic Cat was aware of

14   this before the research that lead to this patent.

15         The interim report issued in February 1999 explicitly

16   talks about using the jet boat, which is the Rheault 938

17   technology, and putting it on a personal watercraft as a

18   solution.  So it's screaming obviousness to try, in the words

19   of KSR.  And although Mr. Christopherson doesn't remember

20   receiving it now, he did monitor the proceedings.

21         Beginning right about that time, the SAE and Mr. Breen

22   does public testing, and they actually test the Challenger Boat

23   at high speed, along with the fins in the other possible

24   solutions they are looking into.

25         In March '99, Mr. Breen provides a public

1   presentation.  And again, Mr. Christopherson doesn't remember

2   it when he's asked in his deposition, but his notes indicate he

3   was there and he heard it and he reviewed and examined the

4   Challenger Jet Boat.

5        The final report -- the draft final report from the

6   SAE study shows that it is effective.  It is certainly a

7   promising tool to apply in a personal watercraft.

8        Separately, Mr. Boudriau, up in Canada, himself

9   applied for a patent on a very similar system.  It talks about

10  a motor and a throttle means controlling the motor speed,

11  sensors to detect turning motion, and a system to maintain

12  power to the motor for a pre-determined period of time when the

13  throttle controls are released during a turning motion.  So,

14  he's actually putting this on a PWC.

15       Now, his application doesn't get published

16  sufficiently early that I can use it the same way that we're

17  using 938.  But you have another example of someone actually

18  combining the thrust reapplication system of Rheault in the jet

19  boat on a personal watercraft.  And it's hard to say it's not

20  obvious when we now have another person who is doing it.

21       The AC response to this in the briefing to suggest

22  that his words were not sufficiently clear, as if we are

23  offering this as a separate 102 reference in itself, whether it

24  enables -- it doesn't have to go that far for 103 purposes.

25  It's just proof of how clear it was to try.

```
 1            And then the ultimate is that my folks did this
 2   themselves in 1998, Mr. Spade and Richard Simard.  But
 3   Mr. Spade was the lead.  And they actually built one system
 4   that took jet boat technology, put it on a Sea-Doo and tested
 5   it.  And as I said, it may have been publicly demonstrated.
 6   But my proof of that, unfortunately, is no longer available
 7   because Mr. Spade passed away of cancer not that long after the
 8   case was filed.
 9            But it was well-received.  It says in the internal
10   report the advantages are no appendage, good efficiency at any
11   speed -- not high, not low, good efficiency at any speed.
12   Disadvantage is none.  Easy idle operation because of speed
13   acceleration.  It would conflict with the operation of the
14   fins.  And an additional link with throttle response represents
15   an important safety issue.  And Your Honor, what that means is
16   that if you have the thrust apply automatically, it can kick in
17   when the driver isn't expecting it and it could conceivably
18   cause problems.
19            In their own evidence, when they did the prototype and
20   showed it to the Coast Guard, the Coast Guard commander
21   actually ran it into the dock for that very reason.  The
22   accused products that we now sell have lots of different things
23   to make sure that doesn't happen.  Most of those would be more
24   relevant to the every-time argument that I made back in Markman
25   that Your Honor didn't accept.  But it is dramatically -- it
```

1    is, in that regard, significantly different.

2         But Proto-14 -- if Proto-14 were brought back into

3    manufacturing today, it would be accused of infringing.  So

4    it's clear evidence that one would be -- would have reason to

5    combine.  And then we lay them all out here -- many, many,

6    efforts to combine these things.

7         So at the end of the day, the question is not whether

8    anybody actually sold one commercially.  It's whether it was

9    obvious to try.  And Your Honor, I submit that this is more

10   obvious to try than it was in KSR.

11        That leaves nothing but the dependent claims.  A

12   couple of the dependent claims talk about a throttle body for a

13   fuel injector, and that was also part of your stock personal

14   watercraft at the time.  So if you're going to take A and mate

15   it with B, just like in KSR, the components of B are already

16   there.  So there's nothing magical.  Those, in the words of

17   KSR, are known elements performing their known functions.

18        The same applies to the proximity switch and magnets

19   in the other dependent claim.  Those are well-used in the prior

20   art, so there's nothing magical about adding them.  That's the

21   equivalent of saying:  "And the personal watercraft is blue,"

22   or, "The personal watercraft has an FM radio," or something

23   like that.  It's already out there.

24        Arctic Cat ultimately tries to defend 103 on secondary

25   considerations, the idea that, well, this has to be non-obvious

1    because they had unexpected resulted.  They argue it's

2    counterintuitive, but they don't actually explain why it's

3    counterintuitive.  And given why so much of the world was

4    saying:  "Please do this," or trying to do it themselves, we

5    submit, as a matter of law, it is not counterintuitive.  But

6    they say that they got an unexpected result that they

7    discovered, that you only need one level of thrust.  So

8    whenever the system fires, and it's going to apply thrust, it's

9    always going to be at the same level.  So for this one boat it

10   will be 3,000 RPM.  For that one, it will be 3,100.

11           Well, remember, Your Honor, when we get to the

12   non-infringement claims and we say:  "Well, we don't do that.

13   We have multiple levels of thrust, so we don't infringe," their

14   response to that is:  "The claims don't require it."

15           Well, you can't have unexpected results that justify

16   your claims for validity purposes if those unexpected results

17   do not reflect themselves in a limitation of the claim.  The

18   full scope of the claim In Re: Kulling, if you're going to have

19   unexpected results, it has to be commensurate in scope with the

20   claims.

21           So either they have unexpected results and the claims

22   require every model to have one, and only one, level of thrust,

23   or they don't.  In which case, they don't have unexpected

24   results.  And I would note, Your Honor, in KSR, there were

25   arguments of secondary consideration.  And the Supreme Court

```
 1    held, in reinstating the District Court's summary judgment

 2    grant, that when the obviousness is clear as a matter of law,

 3    arguments about secondary considerations do not necessarily

 4    overcome that.  They would have to be incredibly powerful

 5    secondary considerations, and we don't have them.

 6            So moving over in the time I have left, I'll start

 7    moving through the non-infringement claims.  Your Honor, you

 8    focused on several other ones, so I'll do the "immediately" one

 9    fairly quickly.  The key on "immediately," we are not dressing

10    up every time in disguise.  It is a matter of what is the

11    trigger.  We have our view of what the claim that you construed

12    is -- and in the Markman order, you actually talked about

13    trigger and used the word "trigger" in explaining the logic of

14    "immediately" following for "after" and "upon."

15            OTAS, when you start moving the steering wheel left to

16    right -- and some of the claims talk about position for

17    turning, and different claims talk about being moved away from

18    a straight-ahead position.  But you can -- if you think of it

19    as a clock, you can move to 12:30 or 11:30.  You can move five

20    degrees either way.  OTAS does not do anything.  If the trigger

21    is what the claim says, position for turning, if you move five

22    degrees, if you move to 1:00, you are positioned for turning.

23    You've turned the wheel.  You may not be making the most abrupt

24    turn you can, but you are positioned for turning.  You are no

25    longer straight at generally straight ahead.  You have rotated.
```

1    So depending on which claim we're talking about, the turning

2    trigger has been met.

3         OTAS doesn't do anything then.  OTAS waits until

4    you're all the way to a full turn.  It's about 25, 26 degrees,

5    something like that, almost all the way out here.  So if you go

6    part of the way, OTAS just keeps waiting.  So the trigger, the

7    thing that happens that causes it to follow immediately, is not

8    what the claim says, which is position for turning, any amount

9    of turning.  It's turning all the way out here.

10        Arctic Cat suggests, well, sometimes that happens

11   really quickly anyway.  So even waiting for the later

12   trigger -- and it's almost as though there's an A, straight

13   ahead; a B, somewhat turned; a C, a little more turned; D, all

14   the way to the right.  For OTAS, you must go all the way to D.

15   That's the trigger.

16        And it doesn't -- it happens immediately after you get

17   to D, but not until you get to D.  So it's not immediately

18   after A, or B, or any of the smaller parts of the turn because

19   it doesn't immediately follow them.  It's not triggered by

20   them.

21        Arctic Cat suggests that sometimes it can be really

22   fast if you turn the wheel really quickly.  It's sort of a

23   stopwatch approach.  The trouble with that is there's no way to

24   distinguish between that and when you turn part of the way and

25   stop and then turn the rest of the way.

```
 1              OTAS doesn't do anything until you're out here.  The

 2      patent would say:  "Immediately upon turning, you got to have

 3      thrust," and OTAS does not do that.  It does it immediately

 4      upon a later trigger.  So if you're applying thrust on a

 5      different event that happens later than the claim says is the

 6      trigger event, then you're not applying thrust immediately

 7      after.

 8              So I'll skip all the OTAS states that we show in here.

 9      I think it's covered in the attachments to the brief.

10              The second is the single level of thrust.  And this

11      isn't one of the ones Your Honor hit up or identified earlier,

12      I think.  But this is the sort of either/or catch-22 argument.

13      Remember, they said we had unexpected results because we have a

14      single level of thrust.  Part of the motion against -- the

15      Daubert motion against Mr. Taylor is in the claim that now the

16      controlled thrust steering system and the agreed construction

17      that Your Honor adopted, it was a thrust at a level and for a

18      time sufficient to avoid an obstacle directly ahead.

19              Mr. Taylor understood "at a level" to mean a single

20      level, given the specification talks about that, and given the

21      inventor testimony, and given that they are arguing that as

22      their unexpected results that supposedly bail them out on

23      invalidity.

24              Well, if that's not the case -- actually, Your Honor,

25      I have to catch up because I just talked my way through almost
```

1    all of these.  Actually, Your Honor, I'm going to have to go

2    back to the non-infringement on the doctrine of equivalents.

3            THE COURT:  Okay.

4            MR. LUKEN:  The doctrine of equivalents argument

5    showed up during briefing, and it was not in their attorney's

6    report.

7            This, I guess, also fits into the Cuzzillo -- our

8    motion to -- our Daubert motion with respect to Mr. Cuzzillo.

9    So Mr. Cuzzillo identifies no doctrine of equivalent options.

10   Arctic Cat suggests that Mr. Cuzzillo adopted by reference

11   their infringement contentions, but he did not.  And even if he

12   did, that's still not the expert opinion.  And in any event,

13   they haven't satisfied the Rule 56 standard here.  As I said,

14   in his report, he doesn't use doctrine of equivalents anywhere.

15   He did not incorporate his counsel's infringement contentions.

16   He merely said, on the very first page -- it's the cover --

17   that he wasn't going to give any opinions on the 969 because in

18   his view the 969 is substantively the same -- I think he said

19   it correlates with the --

20           THE COURT:  Right.  He stated it applies with equal

21   force to the asserted claims of the 969.

22           MR. LUKEN:  He didn't -- yes, Your Honor.  But he

23   didn't explain what they were.  The claim elements are not the

24   same.  If one looks at what counsel did in their infringement

25   contentions, they went through element-by-element in the 969,

1    the way their expert should have.  And where the element was

2    identical to something in a different claim, they said:  "See

3    Element X, Y, Z in the other claim."  But on others, they gave

4    specific -- because the claim language is different -- what I

5    was explaining before about some of them are positioned to turn

6    and some of them are rotated from generally straight ahead,

7    there is language that's different from one claim to another.

8    And their expert completely basically blew that off.

9         What he did is he offered what counsel had done as

10   supposed proof that the claims were so close that he didn't

11   have to give opinions on the 969.  And regardless, he did not

12   adopt -- whatever he was saying -- if he was trying to say:

13   "Take my 545 opinions and translate them.  I, as an expert,

14   don't have to" -- if he was saying that's what he wanted to do,

15   he had no opinions in his report on the 545 about the doctrine

16   of equivalents.  He did not incorporate their doctrine of

17   equivalents.  He used that as an example of why he could quit

18   after he only attacked one of the patents, which I don't think

19   Rule 26 permits.  If they're going to say these patents are

20   sufficiently different that they get to sue us under both,

21   their expert should provide opinions under both, instead of

22   getting halfway through and saying:  "Court, jury, and

23   Defendants, you figure it out from here."

24        But regardless, the most he was doing is saying:

25   "That excuses me from repeating my 545 arguments over again."

1    His 545 arguments in his report don't have anything about the

2    doctrine of equivalents.  So he should not be allowed to now

3    argue about the doctrine of equivalents.

4         Even if he could, Your Honor, it reads "after" and

5    "upon" out of the claims.  It would vitiate the claims.  And

6    that's Warner-Jenkinson and Freedman.  Your Honor went to great

7    lengths to discuss why "immediately" following is critical.

8    And as I mentioned before, if you can infringe regardless of

9    the immediacy of acting on the trigger, you've eliminated the

10   whole need for "immediate" as a construction for "after" and

11   "upon."  So it reads it out of the claim, and that's

12   impermissible.

13        Your Honor didn't bring up the means-plus-function

14   argument.  This clearly is a means-plus-function claim as

15   construed.  There is no law cited by the other side that -- a

16   means-plus-function is when you have -- instead of saying "a

17   high chair," you say "a means for elevating a baby so that you

18   can feed them."  And you can do either.  But if you do the

19   means, it could be broader, but you're restricted to the

20   structure that you show in the claim.

21        And for a long time, you had to -- it was -- the way

22   the Federal Circuit argued, it was a strong presumption against

23   the means-plus-function claim if you didn't use the word

24   "means."  Williamson got rid of that right around the time just

25   before Markman was submitted.  And then since then, the -- I

1    think it was the Bauer or the Joao -- I'm forgetting the name

2    right now -- case following on Williamson, which happened after

3    our claim construction, said "system" is just such one of those

4    terms.

5          Our expert opined that looking at this spec -- or

6    looking at this language as construed, one does not see

7    structure.  And given that they said their invention is so

8    novel in 1999, or when they applied, I'm not sure how anybody

9    would have looked at that language and said:  "Wow.  I they see

10   exactly the structure they have in mind."  If they would, it

11   emphasizes just how obvious these patents are.  But they are

12   limited to the structure.  You can only infringe this claim.

13   If you use the structure that's shown in the specification, the

14   structure in the specification is mechanical.  It's solenoids,

15   it's cables, and we have a computer system that monitors and

16   sends signals.  So we don't infringe on that ground, either.

17         THE COURT:  I think finally is the issue with regard

18   to the damages limitation and the application of 287 and the

19   failure to mark.

20         MR. LUKEN:  Your Honor, on marking, which -- there we

21   go.  Okay.  287.

22         First -- I mean, there are two steps.  Were there

23   products sold that practiced the -- by their licensee, for whom

24   they are responsible, which practiced the invention.  And

25   there's an extensive attachment to Mr. Taylor's report, some of

1    which we attached to the motion papers, in which he goes

2    through numerous Honda documents, manuals, in a way that is at

3    least as good as what they did in their expert report and in

4    their infringement disclosures.  And I think we point out the

5    parallels here, which shows that there is a controlled thrust

6    steering system.  If we are infringing, then Honda was

7    practicing.

8           As we pointed out in our reply brief, there is a split

9    in the law over who has the burden of establishing that there

10   was a product that practiced the patent.  There are a number of

11   cases -- and we cited a few of them -- where when it's a

12   licensee and the license doesn't require the licensee to mark,

13   that the burden is actually on the patent owner.

14          Here, Your Honor, even if the burden's on us,

15   Mr. Taylor gives at least as good a showing of infringement by

16   Honda as the Plaintiff has shown against us.

17          That certainly has, for Rule 56, moved the ball across

18   where the burden shifts to them to show something indicating

19   either that Honda did not practice it or that Honda marked.

20   And they can't do either of those.  This is a clear Rule a 56

21   question of law.  On the first issue, the only thing their

22   brief says is that they don't like our evidence.  But they

23   don't counter it with any evidence that says Honda was not

24   practicing the invention, and that falls way short of a Rule

25   56 -- meeting the Rule 56 standard.

1           And with respect to whether Honda marks, there, the

2    burden is clearly on them.  And they can hardly say that Honda

3    was marking when their own license told Honda that Honda didn't

4    need to mark and they knew darn well that that was going to

5    impede them from getting damages.  So on the marking statute,

6    Your Honor, they are clearly are prohibited from any

7    pre-complaint damages.

8           I would submit laches is even the stronger argument,

9    but because of SCA, SCA, in the en banc decision -- which I

10   know there's a sur petition pending.  The Supreme Court has not

11   accepted or denied it.  We're getting a lot of orders this

12   time, so it may come up.  I'd hate to predict, but the Supreme

13   Court already has a couple patent cases on its docket.  So I

14   don't know that it's anywhere near a given they're going to

15   take it.  But until then, the en banc decision in SCA is the

16   law of the Federal Circuit.  And SCA expanded the Aukerman Rule

17   about damages -- about laches beyond just damages through the

18   complaint and said in extraordinary circumstances it can bar

19   any damages.  That is new law.  There aren't -- I couldn't find

20   any cases.

21          But Your Honor, here, 10 years of delay?  They have

22   virtually no documents.  We couldn't even get a 30(b)(6)

23   witness from them until the day before discovery ended because

24   they couldn't find anybody to tell us what had gone on.  They

25   can't deny or confirm numerous facts.  Mr. Christopherson was

```
1    at meetings, but he can't remember -- where he very well was

2    told by Mr. Breen the very thing that they turned around and

3    patented, but he can't remember the meeting well enough.

4         Mr. Spade put together a system that probably is 102

5    prior art, if we could show that it was publicly used.  But

6    Mr. Spade's passed away and we don't have the system anymore.

7    This is as strong a laches case -- even if it wasn't six years,

8    we've put enough evidence to make the laches case out, and they

9    haven't pushed enough back to meet the Rule 56 standard.  If we

10   had -- but we have the presumption our way because it's six

11   years.  They certainly have not shown a question of fact there.

12   So the patent's as invalid as a patent's been since KSR, Your

13   Honor.  There's multiple non-infringement grounds, and they

14   can't recover damages both because of marking and laches.

15        THE COURT:  Thank you, Mr. Luken.  I'm going to hold

16   you to your time, sir.

17        MR. LUKEN:  Thank you.

18        MR. BOEBEL:  Your Honor, we have a presentation as

19   well.

20        THE COURT:  All right.  Thank you, sir.

21        MR. BOEBEL:  We've broken up our argument.  Mr. Myers

22   will handle the validity issue and Dr. Cuzzillo, and then I'll

23   handle any remaining issues.

24        THE COURT:  All right.  Thank you.

25        MR. BOEBEL:  Thank you.
```

1          MR. MYERS:  Good afternoon, Your Honor.

2          Your Honor won't be surprised to hear that we have a

3  completely different take on the Rheault 938 patent and the

4  invalidity issues in this case.

5          Your Honor, fundamentally, Rheault is -- it's a

6  different system.  It has different components.  It's installed

7  on a different type of vehicle and it has a different intent.

8  And even if you took counsel's argument at face value, that one

9  would have been motivated to put the Rheault low-speed docking

10 assistance system onto a PWC, it doesn't matter because it's

11 still not what Arctic Cat invented.  It's still different.

12 It's a different system, and that's a leap that they have never

13 been able to cross in this case.

14         True to its name, the Rheault patent describes a

15 low-speed steering system to enable the operator of the vehicle

16 to manage docking and careful maneuvering of the watercraft

17 vehicle.  It's read in the abstract.  There are variations of

18 that type of language throughout the patent.  There's a lot of

19 technical discussion with an emphasis on carburetor biasing as

20 a part of the Rheault alleged invention.  And this is the way

21 that Rheault described its novelty when it was talking about

22 the prior art.  These are the words of Rheault, the patent.

23         None of the prior art patents disclose a means for

24 controlling movement of the watercraft vehicle at low speeds by

25 means of activating and controlling the carburetor and the air

1    fuel mixture being supplied to the carburetor.  So when there's

2    all of this discussion about it being irrelevant, whether it's

3    a low speed or high speed, it's significant that this is the

4    way in which Rheault itself described its own novelty over the

5    prior art.

6           Rheault does not include several components that are

7    variously discussed in the claims.  This is in our brief.  I'm

8    not going to repeat them all.  One of the main ones is a

9    throttle lever biased toward an idle position.  It's just a

10   completely different system, Your Honor.  Arctic Cat's patents

11   describe a system intended for obstacle avoidance, including at

12   higher speeds in emergency situations.  This is something

13   that's written into the Court's claim construction.  I believe

14   it was the controlled thrust steering system limitation.  The

15   idea of it intended for obstacle avoidance is in the claim

16   construction.  It's a signature component of Arctic Cat's

17   patents.

18          The patents disclose a steerable thrust that's engaged

19   upon release of the biased throttle lever and rotation of the

20   steering mechanism, and the biased lever is a really critical

21   part of the patents.  It's not in the nature of the Rheault

22   low-speed docking system.  It is -- Rheault is not an OTS

23   system that engages by design, whether the driver intended to

24   intentionally engage it or not.  It's a system true to its

25   nature.  It's being intended for emergency situations, panic

1    situations, high-speed obstacle avoidance that intends, whether

2    the driver thinks to engage it want or not.  There's moment in

3    which the driver says:  "Wow.  I need to shift into off so

4    we're in idle and now I'm going to steer the vehicle."  That is

5    not what Arctic Cat invented, and that is what Rheault is.

6    Arctic Cat invented a system that automatically engages the

7    thrust, automatically goes to idle, and the wheel is turned,

8    and that's when the steering system engages.

9         There was a lot of discussion about the KSR case in

10    the argument.  And it's not that uncommon for defense counsel

11    to say:  "Well, look, this patent is even more obvious than the

12    patent in KSR.  That's not unusual to hear in a patent case,

13    Your Honor.  But BRP argues in its briefs the language from

14    KSR, which says if the claim extends to what is obvious, it is

15    invalid under 103.  And we don't dispute that statement of law,

16    but the fact is Arctic Cat's patents do not extend to the

17    Rheault low-speed steering system.  Rheault discloses a

18    completely different system, created for a different purpose,

19    and it's missing several elements of Arctic Cat's patent

20    claims.

21         And it's not the case, you know, whether or not the

22    claims would cover both low-speed and high-speed operation.

23    That's kind of a red herring argument.  The point is that, true

24    to the intent of whether it applies to a high-speed or

25    low-speed-operation, Rheault discloses a perfectly different

1   kind of system to effectuate what it's intended to do.  It is a

2   low speed directional control system and it's referred to as

3   docking assistance program -- docking assistance system --

4   excuse me, Your Honor -- in the Challenger Jet Boat that is the

5   commercial embodiment of this patent.

6           Your Honor, it bears noting that the US Patent and

7   Trademark Office has largely agreed with the same thing.  The

8   Rheault 938 patent was listed prior art under Arctic Cat's

9   parent patent application.  This would be their original

10  application that was filed led to Arctic Cat's 059 patent.  If

11  Your Honor compares the issued patents of the 059 patent to

12  Arctic Cat's 545 patent, those claims look very similar and are

13  in a very real way directed to the same technical issue.  And

14  yet, the patent office issued this claim over the Rheault prior

15  art, the specific prior art that BRP is saying is invalidating

16  prior art in this case.

17          And not just the 938 patent, Your Honor.  There was

18  another Rheault patent, the 833 patent, that was specifically

19  identified as prior art on both of the two patents that are

20  asserted in this case.  It's effectively the US counterpart to

21  the Rheault Canadian application.  And the US Patent &

22  Trademark Office looked at it and said:  "Yeah.  These claims

23  are still patentable.  They are still novel over this prior

24  art."

25          I won't repeat the patent's office analysis.  But one

1   of the things that the patent office found significant is the

2   biased throttle lever.  Consistent with the way that it

3   operates in an emergency situation, the rider is not deciding

4   to engage the system, Your Honor.  It just engages for the

5   rider.

6          Another thing that really separates this case from not

7   only KSR, but certainly any obviousness case that I have ever

8   litigated in 15 years of doing patent cases, BRP is using an

9   expert in this case who is saying things as a paid expert in

10  2016 that appear so different than the things that this expert

11  said in 1999.

12         In 1999, he was telling things to the US Coast Guard

13  in a study that was intended to serve the public interest to

14  promote safety, possibly save lives.  Mr. Breen looked

15  specifically at BRP's jet boat technology.  He looked

16  specifically at the jet boat technology, and his reports are

17  replete with all kinds of statements that are very inconsistent

18  with what he's saying today.  He says today that it was his

19  view by March 1999 that it was very clear to all persons with

20  skill in the art and persons in the PWC industry that throttle

21  reapplication, similar to that demonstrated by the Challenger

22  Jet Boat, was a viable approach to OTS.

23         Your Honor, but in 1999, contemporaneous with when he

24  was actually analyzing the jet boat -- by the way, he didn't

25  review it again for his report.  He's just going on memory.

1    BRP has the burden of establishing this by clear and convincing

2    evidence.  They didn't even go out and have Mr. Breen test the

3    boat again.  He's going on memory.  And you know, back in 1999,

4    he said that this technology wasn't applicable, it hadn't been

5    developed to the point of application for PWC.  And those are

6    only two of the statements.  Our brief has all kinds of

7    statements very inconsistent with what both Breen and BRP are

8    saying today.

9         Your Honor, BRP doesn't even really address the

10   inconsistencies.  What BRP attempts to do is to recast Arctic

11   Cat's argument as really focusing on whether there was a

12   commercial sale.  But the point is whether -- is not whether or

13   not there was a commercial sale.  The point is that their

14   invalidity case, to a very large degree, is resting on

15   Mr. Breen's opinions today.  And those opinions are very

16   different than what he expressed 17 years ago.

17        At a minimum, this should go to a jury to decide

18   whether Mr. Breen's opinions today are credible and consistent

19   with what he said back in 1999.  If for no other reason, this

20   case needs to go to a jury because BRP needs to account for the

21   difference between what is being said today -- about its own

22   technology, by the way -- compared to what was being said back

23   in 1999.

24        KSR did change obviousness law.  But what KSR did not

25   change is that there has to be some motivation to combine

```
1    elements.  There still has to be a motivation.  BRP's reply

2    brief has largely offered three things as alleged motivation.

3    The fist thing is this statement in the Rheault patent that

4    it's applicable to PWCs.  The statement's, Your Honor -- the

5    statement's there, Your Honor, but that provides no actual

6    teaching of anybody as to how you would do it.  And I know that

7    BRP never seems to have actually done it, at least in a level

8    in which they could come out with a product.  That's not

9    teaching.  It's just not that easy.  You don't get to just make

10   a throw-away statement and a patent and effectively say:  "Oh,

11   yeah, you know, that would work on PWCs, too, and nobody could

12   later develop it because, look, we already said it in a

13   one-sentence -- in our patent."

14        If BRP had actually been able to do it, then certainly

15   BRP would have tried to patent claims applying this system to a

16   PWC.  And if BRP had tried to get those claims, the patent

17   office would have said, effectively:  "You're crazy.  You can't

18   get patent claims covering a PWC based on one sentence in a

19   patent that says that this might be applicable to PWCs."

20        Again, Your Honor, even if there was motivation to try

21   it, again, it's a different system.  You're still putting the

22   low-speed docking system on a PWC.  So you have a PWC, and it's

23   still different than Arctic Cat's system.  Even if you put it

24   on there, it's still a different thing.

25        The alleged motivation to combine, Number 2, Proto-14.
```

```
 1    Your Honor, we filed a motion in limine trying to exclude
 2    Proto-14.  We can't tell exactly what it is.  The documents are
 3    unclear.  They are contradictory in numerous ways.  For every
 4    so-called positive, you know, statement that counsel just
 5    discussed, there are statements indicating that BRP didn't
 6    think it was going to work.  It's just -- it's -- I'll put it
 7    this way:  It's far less than the clear and convincing evidence
 8    that BRP would need to hope to establish invalidity, let alone
 9    to establish it on summary judgment.
10         Alleged motivation to combine, Number 3, the SAE
11    documents.  Your Honor, I already discussed them.  There's not
12    another obviousness case that I've ever seen where an expert is
13    trying to take this many sides on the same issue.
14         Your Honor, just kind of concluding the invalidity
15    argument, these patents are valid as a matter of law.  We have
16    a special US statute, 35, USC, Section 282, that says these
17    patents are presumed valid as a matter of law.  They are
18    especially presumed valid where the US Patent Office is
19    presumed to have done its job and understood the difference
20    between the claims issued in the prior art, and BRP needs clear
21    and convincing evidence to overcome that presumption.
22         Clear and convincing evidence isn't contradictory
23    statements by an expert from 17 years apart -- 16 years apart.
24    Clear and convincing evidence isn't a Proto-14 that nobody can
25    tell exactly what it was.  At a minimum here, there are
```

1    material fact issues and some credibility issues, some rather

2    serious ones, precluding summary judgment.

3          With that, Your Honor, I was going to transition to

4    Mr. Cuzzillo because that's just how we have kind of divided up

5    the argument here with my co-counsel.

6          I will be really brief in Dr. Cuzzillo.  Dr. Cuzzillo

7    is qualified to offer opinions in this case.  He is an

8    eminently-qualified mechanical engineer.  He has done a lot of

9    engine and control system cases.  I have worked with him on at

10   least one of these cases.  If BRP wants to stand up at trial

11   and try to discredit Mr. Cuzzillo -- Dr.  Cuzzillo because he

12   has never ridden a PWC, BRP is free to try do that, but it's

13   not a reason to exclude his testimony.

14         Some of the specific complaints about his report ring

15   largely as form over substance.  I think that --

16         THE COURT:  But is it really form over substance when

17   the Court is tasked with determining the issue relating to the

18   doctrine of equivalents, and I look at Dr. Cuzzillo's report

19   and he fails to provide any analysis other than his statement

20   at the beginning of his report.  And that's the basis of the

21   motion to strike.

22         So when we speak of form over substance, isn't it

23   significant that he sets forth no opinions with regard to the

24   969?

25         MR. MYERS:  Your Honor, I don't agree that he set

39

```
 1    forth no opinions with regard to the 969.  He did have a

 2    statement saying that his opinions would apply with equal force

 3    to a 969.  And yes, he did attach Arctic Cat's claim chart that

 4    was provided earlier in the case.

 5         The more common complaint that I usually see is that

 6    an expert did provide a really long narrative explanation that

 7    went beyond the claim chart that a party provided earlier in

 8    the case.  Actually, BRP is trying to ding one of our experts

 9    up in a Minnesota case on this is exact basis.  It's not

10    uncommon to incorporate a claim chart.  It's not uncommon to

11    use a claim chart to convey this type of information.  Is it

12    the most elegant thing in the world?  No, it's not.  And

13    sometimes you get that kind of thing from experts, especially

14    technical experts.  But does it rise to the level where we are

15    going to preclude him from testifying about it?  And I don't

16    think that this rises to that level, Your Honor.

17         The same with the statements on claim construction.

18    Did Dr. Cuzzillo quote the claim construction order in every

19    place?  No, he didn't.  But he was asked about this at his

20    deposition.  He certainly intended to -- everything he said to

21    be consistent with the Court's claim construction order.  He

22    might not have always used the same words, but that was the

23    intent.  And again, if BRP wants to -- at trial to beat up

24    Dr. Cuzzillo on that, that's fine.  But that's not a reason to

25    exclude his testimony in this case.
```

1     THE COURT:  So Dr. Cuzzillo will not be rendering any

2  opinions related to the doctrine of equivalents?

3     MR. MYERS:  Your Honor, he wouldn't be rendering any

4  opinions other than those that --

5     THE COURT:  Other than his statement -- and I just

6  want to be sure I understand that he would merely state that

7  the asserted claims of the 969 correspond to equivalent claims

8  in the 545, and that would be the extent of his opinion?

9     MR. MYERS:  No, Your Honor.  I don't believe that's

10 correct.  He would be allowed to testify to anything that was

11 in the claim chart that he referenced in his expert report.

12    THE COURT:  As to the 969?

13    MR. MYERS:  Yes, Your Honor.  That's correct.

14    I don't think it's at all uncommon for an expert to

15 convey opinions on infringement in the form of a claim chart.

16 Infringement opinions generally are often conveyed in the form

17 of a claim chart showing where the particular limitations of

18 the claim read on the accused devices.  It's just one way to

19 convey the opinions.  And I don't think it's uncommon or any

20 basis to impose a rather severe penalty of allowing him to not

21 talk about those things.

22    THE COURT:  All right.  Thank you.

23    MR. MYERS:  Thank you.

24    MR. BOEBEL:  Thank you, Your Honor.

25    Hopefully, we can move through the infringement issues

1  fairly quickly.  It's important to -- with respect to

2  infringement, it's BRP's burden to essentially point out where

3  Arctic Cat allegedly has a failure of proof.  And what BRP has

4  pointed to really are three fairly specific points.

5          One, they allege that the controlled thrust steering

6  system is a 112.6 claim limitation.

7          Second, they claim that the BRP PWC do not activate

8  OTAS immediately.

9          And third, they say that there has to be essentially a

10  single level of engine RPM.

11          Now, Mr. Luken says that what that issue relates to is

12  a single level of thrust, but that's actually -- he's got it

13  backward.  What Mr. Taylor is focusing on is not thrust per se.

14  What Mr. Taylor is talking about is the engine speed.

15          And just to dovetail back to another point that

16  Mr. Luken made, the unexpected result that Mr. Breen found was

17  not that there was a single level of thrust.  It was that you

18  could achieve a controlled thrust steering at any speed using a

19  single engine RPM.  That was a remarkably unexpected result

20  because everybody in the industry -- and you know, we think the

21  Boudriau patent is very unclear.  But one thing that it does

22  talk about is the fact that you are applying different levels

23  of engine RPM at different watercraft speeds.

24          And what Arctic Cat discovered in the course of their

25  research and in the course of their testing was that because

1    the jet propulsion engine operates at a higher legal of

2    efficiency at higher speed -- and Mr. Taylor testified to this

3    in his deposition -- that at a single-engine RPM, whether the

4    PWC is going 20 miles an hour, or 30, or 40, or 50, you could

5    achieve the type of controlled thrust steering that allows a

6    rider to avoid the obstacle without oversteering the

7    watercraft, without spinning out, or without -- without tipping

8    the watercraft over.  So in that sense, that's important both

9    from a validity standpoint and from an infringement standpoint.

10            If you could go to Slide 17.

11            Just a few words with respect to "immediately."  Now,

12    the basis of BRP's non-infringement argument is:  "Look, in all

13    of the Arctic Cat patents, and all of the claims, as soon as

14    you begin rotating the handlebars, you have to trigger the

15    application of the controlled thrust steering system, except

16    that's simply not true.  Figure 13 discloses a system in the

17    body of the patent specification itself where the handlebars

18    need to be turned approximately seven/eighths of a turn to full

19    locked position before a controlled thrust steering system

20    activates.  And we actually have an animation on the next page

21    that shows -- if you could replay it -- that essentially the

22    magnet and the trigger angle move together as the handlebars

23    turn.  And when the trigger angle hits the proximity switch,

24    84, then the controlled thrust steering system activates, and

25    it activates immediately.  But the idea that somehow the patent

1    claims would not try to incorporate this embodiment is -- well,

2    it's inconsistent with the law.  But it's also just -- it's

3    flatly contradicted by this embodiment of the patents.

4          With respect to "immediately," you know, a few points

5    made on the slide.  But, you know, one very significant issue

6    is that Taylor himself, in his expert report, says that

7    "immediately" can be defined in reference to mechanical

8    activation time.  That is, between a half a second and a

9    second.  And really, that's -- in the kind of panicked

10   circumstances in which the Arctic Cat patents apply, handlebars

11   have a very narrow range to full lock and the rider turns the

12   handle bars very, very quickly.  I mean, that's the classic

13   scenario.  And within that scenario, a half second to a second,

14   as acknowledged by Mr. Taylor, is immediately.  At a minimum,

15   it is a question of fact that the jury should address.

16         With respect to a controlled thrust steering system,

17   it quite simply is not a means-plus-function limitation.  What

18   BRP and Mr. Taylor are doing is they are essentially taking the

19   Court's construction and they are saying the Court's

20   construction is the recited function.  That is error as a

21   matter of law.  That is just not how means-plus-function claims

22   are construed.  Micro Chemical, from the Federal Circuit, 1999

23   case, makes that absolutely crystal clear.  That's exactly what

24   the Court did in that case; construed the claim, said:  "That's

25   the function."  Then because that was the function, applied the

1    incorrect corresponding structure.  Federal Circuit said:

2    "Nope.  The Court" -- or sorry -- "the recited function is the

3    function specifically recited by the claim."

4            And if we go to the next slide, and we take a look at

5    Claim 15 of the 969 patent, there is no recited function in

6    this claim.  It is just a controlled thrust steering system.

7    It is a stand-alone component.

8            Now, with respect to kind of the separate issue of,

9    you know, what if it is a means-plus-function element, BRP --

10   the basis of their non-infringement with respect to that claim

11   limitation is:  "Look, we have a software-based system.  All of

12   the embodiments in the Arctic Cat patents are mechanical."

13          Now, there are various types of mechanical

14   embodiments.  There are electronic circuits.  There are cables,

15   shocks, compressible material.  But the Supreme Court -- sorry

16   not the Supreme Court -- the Federal Circuit -- and they have

17   been saying this for decades -- that hardware and software can

18   be equivalent with respect to means-plus-function claim

19   limitations.

20          And if we go to the next slide, BRP's own 30(b)(6)

21   witness said that.  The OTAS system that BRP implemented on the

22   3D product back in 2004, that was a mechanical system.  It

23   relied on cables.  It had a solenoid.  And it functionally was

24   identical, as Mr. Plante testified, to the subsequent 2009 and

25   later software-implemented OTAS system.

```
 1          Mr. Kamen, in his deposition, testified basically
 2     identically to Mr. Plante.
 3          Single level of thrust.  I've addressed this already,
 4     but the key issue here is that Mr. Taylor is essentially
 5     rewriting the Court's claim construction.  He is changing
 6     "thrust" to "engine speed."  And then he's saying:  "Instead of
 7     the thrust, you have to have a single engine speed," and he's
 8     incorrect about that.  But, the most important point is that it
 9     cannot be the case.  It is flatly impossible for the Arctic Cat
10     patent claims to be limited to a single level of thrust.
11          Now, you could limit them to a single of engine speed.
12     That would be wrong.  But with respect to thrust, it is
13     inherent in the operation of a jet propulsion engine that
14     different levels of thrust will be provided at different
15     speeds.
16          If we could go to the next slide.  The patent
17     specification specifically recognized this phenomenon.  Now --
18          THE COURT:  Mr. Boebel, I just want to give you enough
19     time to address the laches and the marking argument.
20          MR. BOEBEL:  Certainly.
21          If we could go to Slide 26.
22          All right.  With respect to laches, what BRP sort of
23     points out with respect to our evidence is three things.
24     First, they say there was unreasonable delay because their use
25     on the 3D product was open and notorious.
```

1           Second, they say:  "Well, you know, we couldn't prove

2      inequitable conduct with respect to the jet boat technology

3      because of the delay."

4           Third, they say:  "We lost Proto-14, and Mr. Spade

5      died and wasn't able to testify."

6           Now, none of those really support summary judgment.

7      Now, with respect to the 3D, it was a niche product.  It failed

8      within three years because of poor sales.  There really is no

9      reason that Arctic Cat would have known about that.  But the

10     more fundamental point is that between 2004 and 2009 the vast

11     majority of BRP's PWC lineup relied on the non-infringing OPAS

12     technology.  Arctic Cat was aware that BRP was using OPAS.

13          Now, it was only in 2009 that BRP began moving a

14     substantial portion of its PWC lineup to OTAS, and that's the

15     accused technology in this case.  That was only five years

16     ago -- or sorry.  That was only five years before the complaint

17     in this case was filed.

18          Now, with respect to inequitable conduct, they could

19     never prove it in this case with respect to the jet boat art.

20     The 833 patent, which essentially has the exact same disclosure

21     as the Rheault 938 patent -- sorry -- patent application -- and

22     is embodied in the Challenger and the speedster jet boats -- it

23     is disclosed right on the face of both the 545 and the 969

24     patents.  And the PTO issued both of those patents over the

25     833.

```
1              Now, with respect to Proto-14, there has to be a nexus

2    between the delay and the loss of evidence.  Now, BRP's Florida

3    facility -- we don't know for sure but this is probably when

4    Proto-14 was destroyed -- it was destroyed by a hurricane that

5    rolled through two months after BRP introduced OTAS on the 3D

6    model.  Two months.  That's not our fault.  Two months led to

7    the loss of some evidence.  A two-month delay in no way could

8    establish a nexus to the loss of evidence.

9              Now, with respect to Mr. Spade's testimony, you know,

10   the simple fact is that Mr. Simard, he led the CARP Project.

11   That was the Cobra Act of Right Plate Project.  And Proto-14

12   was one of the prototypes that was built in connection with

13   that project.  Mr. Simard testified extensively about Proto-14.

14   He extensively documented the CARP Project, its successes, and

15   its failures.  And the simple fact is that Mr. Spade's

16   testimony would not add anything to what Mr. Simard knew and

17   was able to testify to, certainly not for purposes of

18   establishing summary judgment.

19             With respect to marking, really the dispute between

20   the parties comes down to a very simple straightforward but

21   fundamental issue.  And that is:  Who has the burden of

22   establishing that the requirements of 287 were not satisfied?

23   Our view, based on a couple of cases that we have cited here,

24   Sealant Systems, Oracle America, is that that's BRP's burden.

25   And that with respect to the user manuals that Mr. Taylor cites
```

1    to, what they have done is they have established a question of

2    fact that requires resolution by a jury.  If, you know, the

3    jury agrees with Mr. Taylor that the Honda PWC fall within the

4    scope of the 545 and the 969 patents, then 287 would apply.  If

5    the jury does not believe that the evidence is convincing, then

6    they can find that 287 does not apply.  We don't believe that

7    the issue has been settled for purposes of summary judgment.

8         Your Honor, I don't know if you would like me to

9    address the Daubert issues with respect to Taylor and Ugone.

10        THE COURT:  If you wanted to -- to make argument now,

11   certainly you can.  I believe that I am decided with regard to

12   Dr. Cuzzillo, so there's no need to make further argument.  But

13   if you wanted to make argument with regard to your motion,

14   certainly.

15        MR. BOEBEL:  Certainly.

16        With respect to Mr. Taylor, our motion really is kind

17   of the flip side of their summary judgment motion.  We think

18   for purposes of summary judgment that BRP just has it wrong,

19   and we think that Mr. Taylor has led them astray.  And for that

20   reason, you know, because Mr. Taylor is attempting to modify

21   the Court's claim construction, is frankly making mistakes of

22   law.

23        With respect to means-plus-function, you know, we

24   think that's grounds to strike at least that portion of his

25   report.

1          With respect to Mr. Ugone, the issue there is really

2    how does the Book of Wisdom apply.  And, you know, the Sinclair

3    Refining case from the Supreme Court, I flatly -- you know,

4    it's from the 1930s, it's never been overruled, and it simply

5    does not support the kind of restricted view with respect to

6    the Book of Wisdom that BRP is pushing here.

7          THE COURT:  Thank you, Mr. Boebel.

8          MR. BOEBEL:  Thank you.

9          THE COURT:  Mr. Luken, if you wouldn't mind responding

10   to three areas.  One is Mr. Breen's inconsistencies in 1999 to

11   the US Coast Guard and his statements today.

12         Secondly, where there is a claim that there is no

13   recited function, if you can tell the Court why Micro Chemical

14   wouldn't apply.

15         And addressing whether Section 287 -- whether that

16   applies, why that is not a question of fact for the jury.

17         MR. LUKEN:  Thank you, Your Honor.

18         In case I can actually -- I'm not sure how easily I

19   can dovetail my presentation into that, but can I have mine up

20   just in case?  I put enough time in it, Your Honor, I feel like

21   I should put it on the screen.  But in any event, Your Honor.

22   I've got my notes kind of organized.  I'm going to take those

23   in backwards order --

24         THE COURT:  Why don't you go in your order and at the

25   end --

```
 1              MR. LUKEN:  No.  Your Honor, what I propose is to

 2    rebut what they did.  And each one of your three points is

 3    something I was going to address, so I'm going to address it

 4    more than I was going to.  And then to the extent I can, I was

 5    going to go into my Daubert presentation.  I don't know how

 6    much of that 15 minutes I still have left.  But if I've got

 7    eight or nine left, I'd like to try to get a little of that

 8    because it deals in more depth with some issues that I kind of

 9    blew through kind of quickly.

10              THE COURT:  All right.

11              MR. LUKEN:  If we can't get to it, it's in the brief.

12              But first on 287, Judge, this is going back to

13    Anderson v. Liberty Lobby and the Supreme Court cases that

14    govern Rule 56.  When confronted with evidence that pushes

15    things across the line, you can't just say:  "This is something

16    the jury would normally decide."  You've got to come back with

17    something that suggests otherwise from which a jury could

18    actually go the other way.

19              On this question of:  Did Honda sell products which

20    practiced the invention, we have Mr. Taylor and an extensive

21    lengthy report using figures from shop manuals from Honda

22    actual products that they now have agreed in the back and forth

23    on the statement of facts for summary judgment were sold here.

24    And Mr. Taylor has shown how the elements of the claims are

25    met, that these things did practice asserted claims throughout
```

1    the time period that they were sold.

2           And in response to that, you heard nothing but

3    attorney argument in their brief and a few seconds ago from

4    counsel.

5           You can't just say:  "The jury might not buy that."

6    You've got to show why it is that there's a question of fact.

7    Mr. Taylor took the Honda products -- and there are multiples.

8    Now, this is a really tough burden to say they get to prove our

9    product infringes without even doing both of the patents and

10   without even disclosing all the details.  And yet, we're

11   supposed to take 10 or 12 Honda products and actually rip them

12   apart?  Your Honor, their disclosures work off of our shop

13   manuals.  Our Honda proof works off of Honda shop manuals.  It

14   has the same diagrams, and it shows -- Mr. Taylor shows very

15   clearly how Honda products practice the claims that are being

16   asserted against us.

17          There is no response from Dr. Cuzzillo on that.

18   There's no response from anybody, except counsel who says:  "We

19   think the jury might disagree with it."  And that is not enough

20   under Rule 56 and the cases from the Supreme Court, the Federal

21   Circuit, and the Eleventh Circuit about how you avoid summary

22   judgment.  And once you're there, there are no questions left

23   because the burden is on them to show compliance.  Once there

24   are products that practice the invention, the burden is clearly

25   on them to show compliance.  Their brief doesn't dispute that.

1   They haven't even attempted to show compliance.  In fact, we're

2   almost -- laches keeps coming back all through this case.  When

3   we deposed them, nobody knows.  They didn't watch, or the

4   person who did watch isn't around, or something like that.

5        So Your Honor, on the marking, we have gone beyond

6   what Rule 56 requires to show that we are entitled to judgment

7   as a matter of law, unless they can create a genuine issue of

8   material fact.  And counsel saying:  "I don't agree with your

9   expert," does not create a genuine issue of material fact.

10       Second question Your Honor had is whether there's a

11  recite -- an actual function recited in the means-plus-function

12  claim, and thus whether it is a means-plus-function claim.  And

13  counsel's argument and Arctic Cat's brief points to the phrase

14  "controlled thrust steering system."  But Your Honor construed

15  that in the way that they proposed and we accepted.  And that

16  is a system for applying thrust -- and I've got the claim

17  construction at my desk, but I believe --

18       THE COURT:  "A system to apply thrust at a level and

19  for a time sufficient to maneuver to avoid an obstacle directly

20  in front of a watercraft."

21       MR. LUKEN:  I always repeat that as:  "Apply thrust

22  strong enough and long enough to avoid the obstacle."  And

23  claims are applied for infringement and for validity purposes

24  as they are construed.  That is the whole reason we bothered

25  you coming here with Markman and made Your Honor issue an

1   opinion construing the claims.  It's the construed claim that

2   matters.  And as construed, you could not get more

3   means-plus-function than this.  It is a what?  A system, which

4   Williamson and Joao tell us is a nonz word just like "means."

5        So it's a system for doing what?  Applying thrust

6   strong enough and long enough to avoid an obstacle directly in

7   front.  That is the recited function.  What matters is the

8   claim as construed, and that is classic means-plus-function

9   language.  Admittedly, the law in this area has changed and

10  become decidedly more supportive of our position, actually,

11  since the Markman hearing.  And that's why the Court, in

12  multiple cases, has the right and the ability to continue to

13  modify its claim constructions as the case goes on.  And in

14  this case, they proposed a construction that made this into a

15  means-plus-function claim.  And at that point, Your Honor, the

16  question is:  What's in the spec?  And what's in the spec is

17  all mechanical.  And what we have is all electrical.

18       There was a suggestion -- there's a quote out of

19  context from one of our people who basically said:  "The boat

20  still stops."  But this part of claim construction and

21  means-plus-function and doctrine of equivalents, infringement

22  is an element-by-element-by-element issue.  And here, it's the

23  controlled thrust steering system that has been construed by

24  the Court in means-plus-function language.  And the question

25  isn't whether the OTAS-equipped boat will stop.  The question

1    is whether whatever is accused of being that controlled thrust

2    steering system is the equivalent of what's in the patent.  Not

3    our earlier product, the patent.  And there's nothing in the

4    specification that looks like OTAS as it is now accused.

5          And the suggestion -- again, Your Honor is getting

6    counsel argument, not what is sufficient facts to overcome a

7    showing for Rule 56.  Counsel said:  "Well, there's lots of

8    cases where people have shown that hardware in that case may be

9    equivalent to software in that case.  And if someone showed

10   that in that case, they survived summary judgment.  But in this

11   case, you don't have any facts or any proof.  You have attorney

12   argument.

13         The third point, Your Honor brought up was whether

14   Mr. Breen is being inconsistent.  And Your Honor, the answer is

15   no.  That was a very carefully calculated argument that was

16   constructed in that brief and earlier today.  Mr. Breen admits

17   and admitted that no one had commercially implemented.  He was

18   charged by the Coast Guard to look into solutions.  He looked

19   into mechanical solutions, like fins.  He looked into thrust

20   reapplication, like on the jet boat.  He was clear.  No one had

21   taken the jet boat technology, put it in a commercially-sold

22   package and sold it.  Like I was saying earlier, that's not

23   required for 103.  That's required for 102, and we are not

24   arguing that this is a 102 case in this motion.

25         103, there's some of it over in one reference.  The

1    rest of it's in the other reference, and would it be obvious to

2    combine.  And Mr. Breen, in the interim report and in the final

3    report, is saying:  "At a minimum, this is obvious to try.

4    This is worth looking into."  He is not guaranteeing that it

5    will sell like hotcakes if it does.

6         There was a suggestion by counsel earlier that we

7    can't even make an obvious argument unless we had taken

8    Proto-14, loved it enough that we had actually commercialized

9    it, sold it, and gotten a patent on it.  That is absolutely not

10   the law of 103.  The question is whether it was obvious to

11   combine in the KSR sense or not.

12        So all of the argument you heard before about:  "Well,

13   Rheault doesn't have this and it's not a PWC," is exactly what

14   the Federal Circuit was told in reversing the District Court in

15   KSR.  Yes, this brake has some of the components.  This brake

16   has the rest.  The question isn't whether anybody's actually

17   put them together and sold it.  The question is whether it's

18   obvious to do that.  And if so, it's not patentable under 103.

19   It's obvious.  And there, the Court said:  "There's just not

20   that many ways to do this.  They're all right in front of you.

21   And when you put them together, they are doing exactly what

22   they did all along.  That's common sense.  That's market

23   pressures telling you to change, and that is obvious.

24        Here, all of those things and more apply.  Market

25   pressure to change?  The NTSB report that they are talking

1    about was saying:  "Hey manufacturers, go out and do something

2    better."

3         A motivation to combine?  You've got Mr. Rheault

4    telling you his invention can be used.  Now, they say he wasn't

5    clear enough to make it 102.  Again, we're not arguing it as

6    102.  I think you can argue it that way.  But I'm not going to

7    do that on summary judgment.  He is saying:  "Try this."  I

8    meant, this is at least obvious to try under KSR.  You've got

9    the fact that Mr. Boudriau did it.  And again, they are not

10   crazy about Boudriau.  They say it's not on its own 102 killer

11   prior art.  We are not advancing it for that on this motion.

12   We're saying that if Mr. Boudriau, tinkering in his garage in

13   Quebec, put this stuff together, you combine that with all the

14   other reasons to put this stuff together, there's ample reasons

15   to put this together.

16        And the argument you heard, and the argument in their

17   brief says:  "Look at that reference on its own, it doesn't

18   have everything.  And look at that reference on its own, it

19   doesn't have everything, and therefore it's not patentable,"

20   and that's just wrong.

21        On infringement, I think I'm not going to have a whole

22   lot of time to get to that second presentation.  But on

23   infringement, Your Honor, counsel suggested that our

24   "immediately" argument is somehow misreading the Court's

25   construction.  Your Honor, you will look in vain in

```
 1    Mr. Cuzzillo's expert report for the word "immediately."  When

 2    he's analyzing whether the accused system meets the claims, he

 3    doesn't ever ask the question:  Does it apply thrust

 4    immediately after the trigger?  He may say they do it pretty

 5    quick.  What he basically says is it happens later than.  But

 6    you will search in vain for any of the Court's constructions in

 7    that report.  The same way that you'll search in vain for the

 8    doctrine of equivalents in that report.

 9         Your Honor, I apologize.  Do I still have any name

10    left?

11         THE COURT:  Do you want to use a few more moments?  I

12    want to give some time for Mr. Myers and Mr. Boebel.

13         MR. LUKEN:  Then, Your Honor, I'm going to skip over

14    Dr. Cuzzillo's report and I'm trying to deal with their attacks

15    on Mr. Taylor.

16         I wouldn't recognize, Your Honor, that the problems

17    with Mr. Cuzzillo not being an expert in this particular

18    field -- and we cite the case in our brief for the fact that

19    you're a mechanical engineer, and this is part of mechanical

20    engineering, doesn't make you an expert in this part of

21    mechanical engineering.  I'm not remembering the case.  It was

22    a Circuit case, and it was a personal injury case, and he was

23    trying to reconstruct an accident outside of his area of

24    expertise.  That's exactly what we have with Dr. Cuzzillo here,

25    and Mr. Kamen doesn't fill in the gap.
```

1            But they have an additional problem when they get to

2     damages because their damage calculation is based on their

3     damage expert saying:  "I'm going to use a $300 valuation for

4     iBR for the brake and reversal system that is not part of

5     OTAS," and he washes his hands of whether that's actually a

6     fair thing to do.  He's the economist that's supposed to put

7     the value on it, but he throws it over to Dr. Cuzzillo.  And

8     Dr. Cuzzillo says:  "Well, to me, they both are about the same

9     in terms of safety."

10            Well, I don't know now Dr. Cuzzillo can tell about

11     safety on personal watercraft, but whether he thinks that one

12     or the other is helpful for safety doesn't put a dollar value

13     on it.  So to the extent that we've got problems with

14     Dr. Cuzzillo, they pyramid into where their damages expert

15     misuses information and therefore basically just guesses.

16            All right.  Mr. Taylor.  There's a question about

17     Mr. Taylor saying thrust versus RPM.  You will find no way in

18     this patent to measure thrust other than through RPM.

19     Everybody talks about thrust in terms of RPM.  And if you're

20     not allowed to use RPM as a surrogate for thrust, we submit,

21     Your Honor, these claims are indefinite under 112 because

22     there's no way to measure thrust.  Both sides use how much RPM

23     there is for thrust.  When they talk about their unexpected

24     result, they talk about a level of RPM.  Everybody equates RPM

25     with thrust.  And if you can't, it's indefinite.

1           The controlled steering system.  I talked about this

2     briefly before, so I'll go through it quickly.  There is ample

3     reason to read the construction that Your Honor did at a level

4     and for a sufficient time that "a level" means "one level."  If

5     it doesn't mean one level, Your Honor, the Court can clearly

6     clear this up by adding to the Markman definition.  If that

7     construction that we submitted jointly, and did not ask you to

8     clarify for us, means a single level of thrust, as we think it

9     does, Your Honor can so rule.  That is a question of law for

10    the Court.  That should not go to the jury.

11          And if Your Honor does so rule, the evidence is clear

12    that we apply multiple levels of thrust and don't infringe.

13          If, on the other hand, Your Honor says:  "No.  When I

14    adopted your construction and said 'a level of thrust,' I

15    didn't mean a single for every accused product, that it's all

16    got to be one."  The Court can do that as well, too, because

17    that is a question of law for the Court, not a question of law

18    for the jury to decide.  But if that's the answer, then these

19    claims are now that broad because they teach -- because they

20    permit single level of thrust or multiple level of thrust.  And

21    as we've pointed out, the specification does not support that.

22    They don't teach how to use multiple levels of thrust.  So it's

23    not enabled to the full extent of the claims.  And remember,

24    one of our supports for why there should be a single level of

25    thrust is in our interrogatories to them, we said:  "How is

1   this enabled?"  They said:  "Because we only have a single

2   level of thrust."  So whether that's a supposedly unexpected

3   result or not, it's either part of the claims -- and that's a

4   question solely for, Your Honor.

5         Mr. Taylor thinks that that's how one should read the

6   construction that's already there.  But if Your Honor disagrees

7   with them, the answer isn't to strike Mr. Taylor as an expert.

8   It's to put your Markman hat back on --

9         THE COURT:  Well -- and maybe I misunderstood.  But I

10  thought that Arctic Cat's position was also that it could never

11  be a single level, that, in fact, jet propulsion was inherently

12  at varying levels.  And I see Mr. Boebel shaking his head.

13        MR. LUKEN:  I think that's their position now, that

14  their claims are not so limited.  And if their claims are not

15  so limited, in our motion, supported by Mr. Breen, we've made

16  the alternative 112 invalidity argument that the claims don't

17  enable anything but a single level of thrust.  And there is no

18  response to that in their moving papers.  They attack -- this

19  is the catch-22 argument.  They attack the first half of it,

20  but they did not respond to the second half it.  And this

21  was -- this is -- and I'm not using "catch-22" in a cute way,

22  Your Honor.  It is one or not other.  The claim is either that

23  broad and it's invalid, or it's narrow and we don't infringe

24  it.  And I don't think -- it's not a question of whether

25  Mr. Taylor is playing fast and loose.  It's a question of

1    whether the Court should clarify its construction.

2            We've already talked about means-plus-function.  And

3    Your Honor asked me a question about that, so I'll skip over

4    that.

5            His "after" and "upon" applies immediately as to the

6    trigger.  Talked about that earlier.  If Your Honor wants to

7    back off of "immediately" -- but Your Honor's Markman opinion

8    does use "immediately following" in terms of trigger, not in

9    terms of it may be a half second, it may be a second.  It's a

10   trigger.  And if the trigger happens that the claim requires,

11   and you don't do anything, you wait for a later trigger, then

12   you're not going it immediately upon the trigger in the

13   complaint or in the claim.

14           Mr. Boebel earlier showed you some diagrams and talked

15   about the fifth embodiment.  For purposes of today, I would

16   like to dispute, but I'm not going to.  They could have made

17   claims that require you to do what we do.  They could have had

18   a claim that says:  "The trigger is when you go to full turn."

19   But the claims that are asserted against us don't say that.

20   They say "position for turning."  So that's a red herring.

21           The issue isn't whether the specification would have

22   been okay to have a claim that says "immediately after you're

23   at full turn," because the asserted claims don't see that.  And

24   Mr. Taylor is interpreting or applying the asserted claims the

25   way Court, I believe, in your Markman opinion indicated.  And

1  if not, again, that's not a reason to strike Mr. Taylor.  I

2  think the Court is free to put your Markman hat back on and

3  clarify.

4          There's other -- about rotationally independent, we'll

5  stand on the briefs.

6          Your Honor, the fight back and forth on the experts on

7  the damages with this Book of Wisdom.  The Book of Wisdom case

8  from Justice Cardozo in 1933 was not a patent infringement

9  case.  It was somebody that didn't convey a patent.  So they

10  were talking about valuing how much the entire patent would be,

11  not a reasonable royalty.

12          The Federal Circuit, in the cases that we cite, and

13  are in my handout up there, has limited purposes said when --

14  the hypothetical negotiation is the time of first infringement.

15  Everybody agrees that's in the latter part of the 2004 here.

16  So you're basing it on what people would have done then.  At

17  that point, we're selling a 3D.  That's what we're selling.

18  And we -- and we've got OPAS, which we are happy with, on the

19  rest of the system.  And our internal documents show that we

20  had a very limited value on OTAS, and that is the expectation.

21          The Federal Circuit says:  "When people are trying

22  to" -- this is a hypothetical negotiation.  No one was actually

23  negotiating in 2004.  I mean, they talked to us in 2000 and

24  then they went to sleep for 10 years.  That's the laches

25  argument.  They didn't do anything.  And by the way, all the

1    argument you heard here, there were no Rule 56 facts there

2    either.  That was speculation on why Arctic Cat, if they had

3    been paying attention, might have not done something.  But

4    there is no evidence in the record that anybody at Arctic Cat

5    paid attention, thought any of the things that Mr. Boebel said,

6    or did any of those things.

7             THE COURT:  Mr. Luken, I'm going to have to call your

8    time.

9             MR. LUKEN:  Thank you, Your Honor.

10            THE COURT:  Thank you, sir.

11            Mr. Boebel?

12            MR. BOEBEL:  Thank you, Your Honor.  Just a few

13   points.  And if the Court has any questions, I'll certainly

14   address them.

15            With respect to obviousness, listening to Mr. Luken,

16   he certainly seems very animated.  But the simple fact is that

17   Mr. Breen, 17 years ago, flat out said:  "This technology has

18   not been developed for application of PWC."  I mean, he said

19   that.  It's indisputable.  Today he's saying the exact

20   opposite.

21            Second important fact with respect to obviousness, the

22   US Patent & Trademark Office issued the Arctic Cat claims in

23   the 969 and the 545 patent over the BRP 833 patent, which is

24   identical to the jet boat art that BRP is arguing invalidates

25   today.  The USPTO has already issued the Arctic Cat patents

1    over the reference that BRP is pushing.  And, in fact, the

2    parent patent to the Arctic Cat 969 and 545 issued over the

3    exact Canadian application that BRP is advocating invalidates.

4          Under those circumstances, we don't see any way in

5    which they have established obviousness under the clear and

6    convincing evidence standard as a matter of law.  It just has

7    not happened.

8          With respect to the means-plus-function claim

9    construction, again, Mr. Luken -- he said it again, that what

10   they are doing is they're taking the Court's construction and

11   they are treating it as the recited function.  That is Micro

12   Chemical.  That's exactly what happened in that case.  Federal

13   Circuit said:  "That's not how it's done."

14         With respect to the other issues on 112.6, we've cited

15   a number of cases in our brief, and I won't go through them

16   unless the Court wants me to.

17         With respect to the single level of thrust issue,

18   Mr. Luken essentially argues that there's a whipsaw here.  You

19   know, either it's a single level of engine RPM or your patents

20   are invalid for lack of enablement or written description.

21   They haven't moved for -- they didn't move for summary judgment

22   on enablement or written description.  Even they apparently

23   recognize that those are fact issues that the jury can resolve.

24         But with respect to the specific question of, you

25   know, the patent requires a single RPM -- engine RPM level,

1    that is -- that is incorrect because what the patents talk

2    about is thrust, not engine RPM.  It's thrust.  And the

3    specification specifically says that what you see during the

4    activation of the controlled thrust steering system is a

5    decrease in thrust over time as the PWC slows down.  That is

6    right in -- that is right in the specification of the 545 and

7    the 969 patents.

8           Because of that, there is simply no way that

9    Mr. Taylor's kind of conversion of thrust to engine RPM to

10   single engine RPM can be correct.  It is -- it's inconsistent

11   with the patent.  And frankly, it's inconsistent with the

12   testimony of the inventors of the patent as well.

13          With respect to the Book of Wisdom, kind of getting

14   back to the damages issues, you know, BRP kind of makes this

15   global argument that:  "Look, the 3D product that we sold in

16   2004," which kind of triggered the hypothetical negotiation,

17   "was a mechanical product.  And because it was mechanical, it

18   was more expensive, so our incremental profit was lower."  But

19   the hypothetical negotiation is a hypothetical negotiation,

20   which means that the parties are assumed to actually understand

21   the evidence that existed at that time and at least have some

22   ability to see into the future.

23          The simple fact of the matter is that before 2004, by

24   2001, 2002, there were completely electronic off-throttle

25   steering systems.  The Kawasaki Smart Steer.  It was already on

```
 1    the market.  And BRP's own analyst, Brian Elmore, described it
 2    as a completely electronic system with no visible parts.  It
 3    was known to BRP that you could have a completely electronic
 4    system years before the hypothetical negotiation.  And, in
 5    fact, Yamaha was out there getting patents on a drive-by-wire
 6    system.  Again, a completely electronic implementation, with no
 7    visible parts, that had an off-throttle steering system in -- I
 8    believe the document says late 1999, early 2000s.  Again, years
 9    before the hypothetical negotiation.  All of this information
10    was not just knowable to the parties at the hypothetical
11    negotiation.  It was actually known.  I mean, they already knew
12    about those issues.  So this idea that you see from Mr. Ugone,
13    and that you heard repeated by Mr. Luken, that somehow the
14    implementation of OTAS in a drive-by-wire system, such as their
15    2009 and later PWC, it's not only -- not only was it
16    foreseeable, it was actually known by the parties at the
17    hypothetical negotiation.
18              Unless the Court has any questions, I'll leave it at
19    that.
20              THE COURT:  Mr. Boebel, thank you, sir.
21              MR. BOEBEL:  Thank you, Your Honor.
22              THE COURT:  I want to thank each of you for the very
23    thorough and excellent presentation.  I am mindful of the time
24    limitations, since we're on the heels of trial, and I will work
25    as hard as I can.  And I believe I've given you the dates for
```

1   the expedited briefing schedule.

2           If there is anything further that we need to

3   address ...

4           MR. LUKEN:  Your Honor, just -- this is pure

5   procedure.  I think -- and I can't remember which document I'm

6   referring to -- but the Court does not normally have a pretrial

7   conference.  With the number of motions that are pending, I'm

8   not sure I'm advocating it as much as I'm saying, Judge, would

9   it be helpful and should the parties plan on such?

10          THE COURT:  Well, it is always helpful to have -- and

11  thank you -- to have a pretrial conference.  You have provided

12  the Court with the pretrial stipulation set of jury

13  instructions.  I believe that the Court's order may limit what

14  is presented.  And I'm looking at the date for -- I believe our

15  calendar call is May 10th.  And I'm wondering -- I'm just

16  looking to see what other cases we have on the docket -- if

17  perhaps we can use that date to spend some time together for a

18  pretrial conference.

19          Would that time period that afternoon work?

20          MR. LUKEN:  We'll make it work, Your Honor.

21          THE COURT:  All right.  Let's -- let me try to get

22  into this calendar from here.

23          We have a lot of criminal cases on that date.  Perhaps

24  I can suggest, if it works for your schedules, that we could

25  have a calendar call and a pretrial conference on that Monday.

```
 1              Would that work?

 2              MR. LUKEN:  My phone's powering up, but I think I'm

 3      going to go out on a limb, Judge, and say I'll make it work.

 4              THE COURT:  Otherwise, I would suggest the 10th, but

 5      perhaps at 3:00 or 3:30.

 6              MR. BOEBEL:  Either one of those works for --

 7              THE COURT:  What's your pleasure?  We're going to be

 8      here on the -- we're going to be here both days, obviously.

 9      But in terms of that afternoon on Tuesday, if you wouldn't mind

10      coming later -- let's say 3:30, even 4:00, then we could spend

11      as much time as we needed.

12              MR. BOEBEL:  That would be terrific, Your Honor.

13              MR. LUKEN:  That would work, Your Honor.

14              THE COURT:  All right.  So why don't we change the

15      calendar call from -- I believe we had it set at 1:15 -- to

16      3:30 on Tuesday, May 10th.

17              Would that work?

18              MR. LUKEN:  Yes, Your Honor.

19              MR. BOEBEL:  Yes, Your Honor.

20              THE COURT:  Okay.  All right, then.  Then I will see

21      you at that time.

22              Have a pleasant afternoon.  Thank you.

23          (Proceedings concluded at 2:57 p.m.)

24

25
```

```
 1   UNITED STATES OF AMERICA        )

 2   ss:

 3   SOUTHERN DISTRICT OF FLORIDA  )

 4                       C E R T I F I C A T E

 5           I, Yvette Hernandez, Certified Shorthand Reporter in

 6   and for the United States District Court for the Southern

 7   District of Florida, do hereby certify that I was present at

 8   and reported in machine shorthand the proceedings had the 19th

 9   day of April, 2016, in the above-mentioned court; and that the

10   foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.

12           I further certify that this transcript contains pages

13   1 - 69.

14           IN WITNESS WHEREOF, I have hereunto set my hand at

15   Fort Lauderdale, Florida this 25th day of April, 2016.

16

17                      /s/Yvette Hernandez
                        Yvette Hernandez, CSR, RPR, CLR
18                      Certified Shorthand Reporter
                        299 East Broward Boulevard
19                      Room 207-B
                        Fort Lauderdale, Florida 33301
20                      (954) 769-5686
                        yvette_hernandez@flsd.uscourts.gov
21

22

23

24

25
```