# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Civil File No. 14-cv-62369-BLOOM/VALLE

ARCTIC CAT INC.,

                Plaintiff,

    v.

BOMBARDIER RECREATIONAL
PRODUCTS INC. AND BRP U.S. INC.,

                Defendants.

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR RENEWED

## JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARDS ...................................................................................... 1

III.    ARGUMENT ...................................................................................................... 2

    A.    The Jury's Verdict of Nonobviousness Should Stand .......................... 2

        1.    BRP Slights the Jury's Role in Determining Nonobviousness ............... 3

        2.    BRP Mischaracterizes the Testimony and Evidence at Trial ................. 4

        3.    Kevin Breen's Testimony was Not Clear or Convincing ...................... 6

            a.    Breen's Testimony was Superficial and Confusing ...................... 6

            b.    Breen's Testimony was Inconsistent with his Prior Statements and his Credibility was Questionable ........................ 8

        4.    BRP Provides No Basis to Throw Out the Jury's Nonobviousness Verdict ........................................................................ 12

        5.    BRP's Other Arguments Fail to Support the Extraordinary Relief Requested in its Motion ........................................................... 15

            a.    BRP's recycled 'objective reach of the claim' argument ........... 15

            b.    BRP's 'Proto-14' argument ......................................................... 16

            c.    BRP's Non-Deference Argument ................................................ 17

            d.    BRP's Secondary Considerations Argument ............................... 18

            e.    BRP's Argument about "Potential Improvements" to the Hypothetical GTX-Jet Boat Combination ........................... 19

    B.    The Jury's Infringement Verdict is Well Founded and BRP's Claim that it is Entitled to Judgment as a Matter of Law or a New Trial is Meritless ..................................................................................... 20

        1.    Reasonable and Logical Inferences Support the Jury's Verdict that BRP Directly Infringed the Asserted Method Claims ................... 20

        2.    The Jury's Verdict that OTAS Activates Immediately is Well Supported by the Evidence at Trial ...................................................... 22

            a.    BRP Misapplies the Court's Claim Construction ....................... 22

     b.  The Jury's Verdict that BRP's OTAS System Activates Immediately is Supported.............................................................24

   3.  The Court's Construction of Controlled Thrust Steering System is Properly Not Limited to a Single RPM Level.......................25

   4.  BRP's Assertion that the Proximity Switch and Magnets are Not Rotationally Independent in the Accused Sea-Doo PWC is Frivolous.............................................................................27

 C.  The Jury's Verdict that the Arctic Cat Claims were Willfully Infringed is Well Supported ...........................................................28

   1.  *Halo* does not remove willfulness from the province of the jury ...............................................................................29

   2.  *Halo* does not impact the validity of the jury verdict ............................30

   3.  Contrary to BRP's assertions, the record contains abundant evidence from which a jury could reasonably find willful infringement............................................................................31

   4.  The Court properly exercised its discretion to enhance damages .................................................................................35

 D.  The Jury's Damages Award was Based on Permissible Evidence and Testimony Directly Tied to the Facts of this Case ................................36

   1.  Mr. Bratic's Reliance on Information Post-Dating the Hypothetical Negotiation was Reasonable and Appropriate ................38

   2.  Mr. Bratic's Reliance on the iBR Brake as a Benchmark to Value BRP's OTAS Implementation of Arctic Cat's Patented Technology was Reasonable and Appropriate .......................................42

 E.  The Jury's Finding of No Patented Articles to Mark (35 U.S.C. § 287) is Well Founded and BRP's Claim that it is Entitled to a Judgment as a Matter of Law or New Trial is Meritless ..........................................45

   1.  The Jury Was Properly Instructed on Marking & Notice (§ 287) ............................................................................46

   2.  Placing the Burden of Producing Adequate Evidence that Honda Sold a "Patented Article" on BRP was Proper ..........................47

   3.  BRP Failed to Establish that Honda Practiced the Patents-in-Suit ............................................................................49

IV.  CONCLUSION.....................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adrea, LLC v. Barnes & Nobles, Inc.*,
  No. 13-cv-4137 (JSR), 2015 U.S. Dist. LEXIS 100312 (S.D.N.Y. July 23,
  2015) ...........................................................................................................................................49

*Allergan v. Sandoz, Inc.*
  796 F.3d 1293 (Fed. Cir. 2015)...............................................................................................20

*Am. Med. Sys. v. Med. Eng'g Corp.*,
  6 F.3d 1523 (Fed. Cir. 1993), *cert. denied*, 1994 U.S. LEXIS 3360 .......................................45

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001).................................................................................................32

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014).................................................................................................43

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*,
  682 F.3d 1003 (Fed. Cir. 2012).................................................................................................29

*Carnegie Mellon Univ. v. Marvell Tech. Group. Ltd.*,
  807 F.3d 1283 (Fed. Cir. 2015).......................................................................................... 37, 38

*Cephalon, Inc. v. Watson Pharms. Inc.*,
  707 F.3d 1330 (Fed. Cir. 2013).................................................................................................27

*Crocs, Inc. v. Int'l Trade Comm'n*,
  598 F.3d 1294 (Fed. Cir. 2010).................................................................................................19

*Eli Lilly and Co. v. Zenith Goldline Pharms., Inc.*,
  471 F.3d 1369 (Fed. Cir. 2006)...................................................................................................6

*Eurand, Inc. v. Mylan Pharms., Inc. (In re Cyclobenzaprine Hydrochloride Extended-
  Release Capsule Patent Litig.)*,
  676 F.3d 1063 (Fed. Cir. 2012).................................................................................................48

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010).................................................................................................44

*Fortinet, Inc. v. Sophos, Inc.*,
  No. 13-cv-05831-EMC, 2015 U.S. Dist. LEXIS 140048 (N.D. Cal. Oct. 14,
  2015) .................................................................................................................................... 45, 47

*Fromson v. W. Litho Plate & Supply Co.*,
  853 F.2d 1568 (Fed. Cir. 1988)......................................................................38, 39, 40, 41

*Golden Bridge Tech. Inc. v. Apple, Inc.*,
  No. 5:12-cv-04882-PSG, 2014 U.S. Dist. LEXIS 67238 (N.D. Cal. May 14,
  2014) ................................................................................................................. 45, 48

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  No. 14-1513, 2016 WL 3221515 (U.S. June 13, 2016) .......................................*passim*

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983) ..................................................................................40

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005) ..................................................................................39

*Heath v. Suzuki Motor Corp.*,
  126 F.3d 1391 (11th Cir. 1997) ..................................................................................47

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
  378 F. Supp. 2d 459 (D. Del. 2005) ...........................................................................39

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ....................................................................................36

*Integra Lifesciences I, LTD. v. Merck KGaA*,
  331 F.3d 860 (Fed. Cir. 2003) .............................................................................. 40, 41

*Johns Hopkins Univ. v. CellPro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998) ..................................................................................13

*Junker v. Eddings*,
  396 F.3d 1359 (Fed. Cir. 2005) ....................................................................................2

*Jurgens v. McKasy*,
  927 F.2d 1552 (Fed. Cir. 1991) ....................................................................................4

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods.*,
  LLC, 2013 U.S. Dist. LEXIS 61272 (M.D. Penn. April 30, 2013) ............................... 48, 49

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012) ..............................................................................8, 18

*KSR Int'l Co. v. Teleflex, Inc.*,
  550 U.S. 398 (2007).....................................................................................................12

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) .................................................................44

*Lucent Techs, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ...........................................20, 39, 40, 44

*Maxwell v. J. Baker, Inc.*,
    86 F.3d 1098 (Fed. Cir. 1996) ......................................................... 45, 47

*McGinnis v. Amer. Home Mortgage Serv., Inc.*,
    817 F.3d 1241 (11th Cir. 2016) .................................................. 1, 2, 22

*Microsoft Corp. v. i4i Ltd. P'shp.*,
    564 U.S. 91 (2011) ..............................................................................17

*Mirror Worlds, LLC v. Apple Inc.*,
    692 F.3d 1351 (Fed. Cir. 2012) ..........................................................20

*Moleculon Research Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed. Cir. 1986) ..........................................................20

*On Track Innovations Ltd. v. T-Mobile USA, Inc.*,
    106 F. Supp. 3d 369, 409-10 (S.D.N.Y. 2015) ................................ 39, 40

*Oracle Am., Inc. v. Google Inc.*,
    No. 10-03561-WHA, 2011 U.S. Dist. LEXIS 131707 (N.D. Cal. Nov. 15,
    2011) ...................................................................................................45

*Ortho Pharm. Corp. v. Smith*,
    959 F.2d 936 (Fed. Cir. 1992) ............................................................32

*PPC Broadband, Inc. v. Corning Optical Commc'n RF, LLC*,
    2016 WL 3365437 (N.D.N.Y. June 16, 2016) ......................................30

*Perkin-Elmer Corp. v. Computervision Corp.*,
    732 F.2d 888 (Fed. Cir. 1984) ...........................................................1, 2

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ..........................................................28

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    No. 14-cv-02061-H-BGS, 2016 U.S. Dist. LEXIS 82532 (S.D. Cal. June
    17, 2016) .............................................................................................30

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009) ............................................................13

*Read Corp. v. Portec Inc.*,
 970 F.2d 816 (Fed. Cir. 1992) ...................................................................................36

*ResQNet.com, Inc. v. Lansa, Inc*,
 594 F.3d 860 (Fed. Cir. 2010) ..................................................................................44

*Retractable Tech., Inc. v. Becton, Dickinson and Co.*,
 653 F.3d 1296 (Fed. Cir. 2011) ...................................................................................2

*Riles v. Shell Exploration & Products, Co.*,
 298 F.3d 1302 (Fed. Cir. 2002) ....................................................................39, 40, 41

*SanDisk Corp. v. Memorex Prods., Inc.*,
 415 F.3d 1278 (Fed. Cir. 2005) .................................................................................26

*Sciele Pharma Inc. v. Lupin Ltd.*,
 684 F.3d 1253 (Fed. Cir. 2012) .................................................................................18

*Uniloc USA, Inc. v. Microsoft Corp.*,
 632 F.3d 1292 (Fed. Cir. 2011) .................................................................................20

*Utah Med. Prods., Inc. v. Graphic Controls Corp.*,
 350 F.3d 1376 (Fed. Cir. 2003) .................................................................................44

*In re Wands*,
 858 F.2d 731 (Fed. Cir. 1988) ...................................................................................27

*Whitserve, LLC v. Computer Packages, Inc.*,
 694 F.3d 10 (Fed. Cir. 2012) .......................................................................................8

*Williams v. City of Valdosta*,
 689 F.2d 964 (11th Cir.1982) ......................................................................................2

## STATUTES

35 U.S.C. § 282 ..........................................................................................................17

35 U.S.C. § 284 ....................................................................................29, 30, 35, 36

35 U.S.C. § 287 ................................................................................................. *passim*

## OTHER AUTHORITIES

Fed. R. Civ. P. 50(a)(1) ...............................................................................................1

## MEMORANDUM OF LAW

### I.    INTRODUCTION

The jury's verdict is supported by substantial evidence and BRP's motion for judgment as a matter of law or for a new trial should be denied.  On validity, infringement, willfulness, damages, and marking, the evidence offered at trial did not require the jury to decide in favor of BRP.  Arctic Cat proved its case to a jury of ten women and men.  That BRP failed to make its case is not a sufficient justification for a second bite at the apple. BRP offers no adequate grounds on which to cast aside the three weeks of work and the close attention that the jury paid to the evidence offered at trial.

BRP's motion should be denied.

### II.   LEGAL STANDARDS

This Court should sustain a jury verdict where a reasonable jury has legally sufficient evidence from which it could find for the non-moving party.  Fed. R. Civ. P. 50(a)(1).  In that regard, "the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party." *McGinnis v. Amer. Home Mortgage Serv., Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1560 (11th Cir.1995)).  "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review. " *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).  "[I]t is the jury's task—not [the court's]—to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *McGinnis,* 817 F.3d at 1254 (quoting

*Shannon v. Bellsouth Telecomms., Inc.* 292 F.3d 712, 715 (11th Cir. 2002)); *Perkin-Elmer Corp.*, 732 F.2d at 893.

Where a post-verdict motion for JMOL "pertains uniquely to patent law" it is reviewed under Federal Circuit law as opposed to the law of the regional circuit, *Junker v. Eddings*, 396 F.3d 1359, 1363 (Fed. Cir. 2005); evidentiary rulings and denials of motions for JMOL are reviewed under the law of the regional circuit. *Retractable Tech., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1302 (Fed. Cir. 2011).

Resolution of a motion for a new trial is committed to the sound discretion of the District Court. On a motion for a new trial (unlike a motion for JMOL), the trial court is free to weigh the evidence. *See McGinnis*, 817 F.3d at 1254 (quoting *Rabun v. Kimberly-Clark Corp.*, 678 F.2d 1053, 1060 (11th Cir.1982)); *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir.1982). On appellate review, "[d]eference to the district court 'is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed.'" *McGinnis*, 817 F.3d at 1255 (quoting *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1498 (11th Cir.1987)).

## III.   ARGUMENT

### A.   The Jury's Verdict of Nonobviousness Should Stand

BRP is not "entitled" to judgment as a matter of law or a new trial on obviousness. Mot. at 1, ECF No. 169. BRP did not provide clear and convincing evidence that Arctic Cat's patent claims were obvious, and the jury's verdict is consistent with both the evidence and the law.

## 1.   BRP Slights the Jury's Role in Determining Nonobviousness

BRP faces a steep burden in seeking to invalidate Arctic Cat's asserted patent claims.

As this Court previously recognized:

> Every patent issued from the United States Patent and
> Trademark Office ("USPTO") "shall be presumed valid." 35
> U.S.C. § 282 . . . .  The burden of establishing invalidity of a
> patent or any claim thereof rests on the party asserting
> invalidity. *See Microsoft Corp. v. i4i Ltd. P'shp.*, 564 U.S. 91, 102
> (2011).  That burden is a "heavy" one. *Id.* As the Supreme Court
> has explained, the burden of proof for invalidity is "constant
> and never changes" – i.e., it never shifts to the patentee – and it
> is to "convince the court of invalidity by clear [and convincing]
> evidence." *Id.*

Order on Motions to Strike and Summ. J. at 29, ECF No. 119.  BRP's burden is no easier

now that BRP has presented its alleged evidence of obviousness to a competent jury, which

for three weeks considered all the evidence and BRP's obviousness arguments, and

unanimously found Arctic Cat's patents nonobvious.

Obviousness is a legal determination that is "based on underlying determinations of

fact."  *Id.* at 30 (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 655 F.3d 1364, 1374

(Fed. Cir. 2011) (citing *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l*, 618 F.3d 1294, 1300 (Fed.

Cir. 2010))).  "These factual determinations include the scope and content of the prior art,

the level of ordinary skill in the art, the differences between the claimed invention and the

prior art, and secondary considerations of nonobviousness."  *Id.* (quoting *Star Scientific,* 655

F.3d at 1374 (citing *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007))).  Viewing the

evidence "through the lens of one of ordinary skill in the art, even when all claim limitations

are found in prior art references, the fact-finder must not only determine what the prior art

teaches, but whether prior art teaches away from the claimed invention and whether there is

a motivation to combine teachings from separate references." *Id.* (quoting *Star Scientific* at 1374-75). "Ultimately, obviousness requires careful judgment and analysis in light of technical facts." *Id.* (quoting *Star Scientific* (citing *KSR*, 550 U.S. at 419)). In reviewing a jury's general verdict of nonobviousness, the Court should "presume that the jury resolved the underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if they are supported by substantial evidence." *Jurgens v. McKasy*, 927 F.2d 1552, 1557 (Fed. Cir. 1991).

BRP has provided no reason to doubt that the jury properly exercised its role as fact finder in this case. More to the point, as discussed below, the jury had every reason to find that BRP failed to prove by clear-and-convincing evidence that Arctic Cat's patent claims were obvious. In fact, the weight of the evidence points strongly to the nonobviousness of Arctic Cat's patent claims.

**2.      BRP Mischaracterizes the Testimony and Evidence at Trial**

BRP's motion inaccurately represents that "[w]itnesses for both parties also agreed that it was easy to incorporate that throttle reapplication system [of BRP's jet boat] into a conventional prior art PWC, such as a 1998 BRP SeaDoo GTX RFI (the 'GTX')," Mot. at 2-3, and—similarly—that "it was undisputed that combining the GTX with the Jet Boat's throttle reapplication system was simple and required minimal work." Mot. at 7.

These allegations are not "undisputed." Not once in the testimony cited by BRP does Dr. Cuzzillo (or any other witness from Arctic Cat) agree that this combination would be easy, simple, or require minimal work. The cited cross-examination pertains solely to the components that were allegedly used in the development of BRP's confidential (i.e., not

prior art) "Proto-14." There was nothing in the testimony confirming, for example, that those were the only components added to Proto-14, that there was minimal work involved, or that those components were sufficient to provide throttle reapplication for obstacle avoidance.[1] Whether or not it was possible to include the jet boat's split-cable system on a PWC, is quite different than suggesting that such a system was easy, simple, or required little work.

Further, Dr. Cuzzillo expressed doubt as to whether the BRP prototype had ever worked, and remarked how "what they didn't have is the teaching that's in the patent." Boebel Decl. Ex. 8 at 217:20-21, 218:3-7, 221:23-25[2]. It is troubling that BRP uses limited testimony about a confidential prototype to wrongly suggest ***that Arctic Cat agrees*** that combining BRP's prior art GTX with BRP's jet boat was "easy," "simple," or "required minimal work." The evidence supports nothing of the kind.

BRP also inaccurately represents that BRP's "Jet Boat disclosed the claimed 'controlled thrust steering system' that 'activates said thrust mechanism to provide a steerable thrust after said lever is positioned other than to provide a steerable thrust and after the steering mechanism is positioned for turning the watercraft.'" Mot. at 5. This is not true. As discussed below, BRP's jet boat lacked numerous elements of Arctic Cat's patent

---

[1] The same testimony includes the following exchange between BRP and Dr. Cuzzillo:

> **Q.** Okay. But your testimony is that a [person] of ordinary skill in the art would not have been able to figure out how to take this cable off a jet boat and put it on a personal watercraft.

> **A.** Not and get a steering – a controlled-thrust steering system, no. Not necessarily.

Boebel Decl. Ex. 8 at 216:13-18.

[2] Unless otherwise indicated, all "Ex. _" references are to the supporting Boebel Declaration, filed concurrently herewith.

- 5 –

claims.  For the inaccurate proposition, BRP cites to a section of the trial testimony where BRP attempted to have its expert, Kevin Breen, testify that **the combination of the jet boat and the GTX RFI** would have included the elements of Claim 15.   BRP's representation and citation to Breen's testimony are inaccurate.[3]

### 3.    Kevin Breen's Testimony was Not Clear or Convincing.

Just as it did at summary judgment, BRP predominantly relied at trial on Kevin Breen's opinions for the alleged obviousness of Arctic Cat's patent claims.  But Breen's testimony was neither clear nor convincing.   Breen's testimony on obviousness was conclusory and superficial, and much of the testimony provided good reason for the jury to question Breen's credibility, bias, and believability.

### a.    Breen's Testimony was Superficial and Confusing

BRP's motion highlights Breen's testimony acknowledging that both the GTX and jet boat were jet-propelled, and concluding "[a]nd so that the idea that I could use one technology with another was obvious and quite apparent that you could do."  Mot. at 7 (citing Breen).  But this testimony is merely conclusory, establishing little other than the existence of the prior art.  *See, e.g., Eli Lilly and Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1379 (Fed. Cir. 2006) ("Rather, to establish a prima facie case of obviousness based on a combination of elements in the prior art, the law requires a motivation [for a person of ordinary skill in the art] **to select the references and to combine them in the particular claimed manner** to reach the claimed invention." (emphasis added)).  In similar conclusory

---

[3] Although not rising to the same level as the inaccuracies above, Arctic Cat also takes issue with BRP's characterization of Mr. Bernier's short summary of his invention as relating to the use of throttle reapplication to avoid collisions, as if to suggest that the asserted patents involved no more details than this.  Mot. at 4; *see* Exs. 10 and 11.

fashion, asked point blank why he thought it was obvious to combine BRP's jet boat technology with BRP's PWC as to certain patent claims, Breen's explanation was that people were aware of BRP's jet boat technology and thus could "take that technology and hardware *and combine it with pretty much off-the-shelf items without having to really build anything else*." Ex. 6 at 13:20-14:10 (emphasis added).[4]

Breen's superficial response—for example, the lack of explanation of exactly what items one could pull from "off-the-shelf," how one might combine those items, and how such a combination would result in the specific invention claimed in Arctic Cat's patents— barely clears the threshold of common sense.[5]  BRP could not fault the jury for doubting Breen's superficial assertion that somebody could take "pretty much off-the-shelf items" and arrive at Arctic Cat's invention "without having to really build anything else."

Based on the unpersuasive evidence presented at trial, the jury could reasonably find that BRP failed to offer sufficiently clear and convincing testimony on each of: (1) the scope and content of the prior art, such that BRP's proposed combination would actually reach the asserted claims of the Arctic Cat patents; (2) a sufficiently high level of skill of those of ordinary skill in the art to create such a combination; (3) differences between the claimed invention and the prior art, alone or in combination, and (4) objective indicia of

---

[4] Led by another question from BRP's counsel, Breen added that the components as combined would individually function the same as when not combined. Ex. 6 at 14.  But this adds little to the substance of Breen's explanation, particularly considering Breen did not really explain why he believed that, or provide any explanation with respect to the individual components.

[5] The other Breen testimony that BRP cites for Breen's alleged explanations of obviousness of the independent claims is located at Ex. 6, 13:20-14:22 and 18:10-19:1 (Breen).  But this testimony is similarly superficial testimony to that cited above.  BRP's Motion does not cite to any testimony from Breen alleging the obviousness of '545 dependent claim 17 and '969 dependent claim 16 (adding a "throttle regulator" element) or dependent claim 19 of the '545 and dependent claim 19 of the '969 (adding "throttle body of a fuel injection system" element).

nonobviousness.  *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1363-68 (Fed. Cir. 2012) (examining each implied jury finding in support of nonobviousness verdict and concluding that the substantial evidence supported the verdict).   Indeed, the conclusory nature of Breen's testimony indicates that he **relied on a hindsight reconstruction using the patent claims as a roadmap**.  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 24 (Fed. Cir. 2012) (noting that "general and conclusory" testimony is not enough to overturn a jury's finding of no invalidity).

### b.    Breen's Testimony was Inconsistent with his Prior Statements and his Credibility was Questionable

The jury also had reasons to question Breen's bias, credibility, and overall believability. [6]  Breen's recommendations to the U.S. Coast Guard in 1999 and his experiences working on the Society of Automotive Engineer's Grant 18—are difficult to rationalize with his 2016 testimony as a paid expert that Arctic Cat's off-throttle steering solution was obvious.   In 1999, Breen authored the SAE's draft recommendations to the U.S. Coast Guard on technologies to address the off-throttle problem for PWCs.  As part of his work, Breen specifically tested BRP's jet boat as a potential solution to the off-throttle steering problem for PWCs, and recommended, among other things, that BRP's jet boat technology "clearly . . . has not been developed for off-throttle steering."   Ex. 6 at 86:5-12 (discussing Ex. 13 at p. 25).  Breen's testimony included the following:

> **Q.**  Okay.  So you evaluated BRP's jet boat technology back in 1999.  And you had the specific objective of reporting to the US

---

[6] The jury instructions specifically allowed the jury to do so.  ECF No. 151 at 2-4("Credibility of Witness"; "Impeachment of Witnesses," and bias of "Expert Witnesses"); Ex. 26 at 126:14-127:1; Ex. 9 at 25:11-21; *see also id.* at 24:4-21.

> Coast Guard about potential off-throttle steering solutions, right?
>
> **A.** Right.
>
> **Q.** And nowhere in your draft final report did you tell the Coast Guard that: "Hey, we think that BRP may have already invented the solution for off-throttle steering on PWCs"?
>
> **A.** Did not.

Ex. 6 at 87:24-88:7.

BRP asserts that "[t]he trial record demonstrated overwhelming market and regulatory pressures on PWC manufacturers to implement solutions to off-throttle steering so that riders could safely avoid obstacles" and that, at least according to Breen, throttle reapplication "was being actively sought out and interested in by people that were in [the PWC industry]." Mot. at 7.[7] But it was Breen who in 1999 had specifically tested the throttle reapplication system of BRP's jet boat and neglected to provide any opinions to the United States Coast Guard identifying such technology as an obvious solution to the off-throttle steering system in PWCs. As Breen testified:

> **Q.** You say that throttle reapplication in a PWC was obvious. But as late as the spring of 1999, nobody had publicly done it yet, right?
>
> **A.** Correct.
>
> **Q.** I mean, we're here in 2016, 17 years later, and you're saying that it was obvious. But you admitted yesterday that when you did your SAE testing, that you had to use one of BRP's boats

---

[7] Breen also testified that in the spring of 1999 "nobody really spent a lot of time working on" a PWC with throttle reapplication. *Id.* at 62:24-25. In addition, the Interim Report for the Coast Guard project stated that "[e]ngine control by reapplication of thrust is not presently proposed by any of the inventors or manufacturers for personal watercraft." Ex. 12, p. 7. Breen admitted this was a true statement at the time it was made. Ex. 6 at 80:8-22.

because nobody had yet produced a PWC with throttle reapplication. Isn't that right?

**A.** Correct. In a similar vein that nobody had produced a PWC with an automatic rudder at that point in time either.

**Q.** You couldn't test a PWC with throttle reapplication because there wasn't one to test?

**A.** Correct.

*** 

**Q.** So in 2016 you say it was obvious, but in 1999 with everybody working on it, nobody had publicly done it? Nobody had done it?

**A.** Right. Nobody had built a unit as of the spring of 1999.

Ex. 6 at 61:19-62:7, 63:7-10.[8]

The jury also heard how Breen was a longtime BRP expert, working on as many as thirty (or more) cases for BRP over the years. *Id.* at 63:11-64:11. The jury heard how Breen had worked on several dozen litigation matters relating to personal injury allegations involving PWCs, including cases where plaintiffs argued that a PWC accident would not have occurred if the PWC had been equipped with off-throttle steering. *Id.* at 65:8-19. The jury heard how, in all of Breen's PWC product liability cases, he represented the defendant PWC manufacturers and never once represented a plaintiff. *Id.* at 65:20-23, 66:7-15.

If the jurors questioned Breen's credibility, bias, and independence of judgment based on the trial testimony, they had every right to do so. ***Of course*** the jurors could question how the same person who told the U.S. Coast Guard in 1999 that BRP's jet boat technology

---

[8] *See also Id. at* 82:1-83:16 (acknowledging that at time of SAE Draft Final report, just two or three months before Arctic Cat filed its first patent application, despite multiple calls for "devices intended to provide off-throttle steering on jet pump propelled watercraft," nobody came forward with a PWC with a working throttle-reapplication system.).

was not developed for off-throttle steering could credibly assert in 2016 (on BRP's dime) that BRP's jet boat technology was the obvious solution to the off-throttle steering problem for PWCs.[9]   *Of course* the jurors could question whether Breen's SAE conclusions were inconsistent with the idea of using BRP's jet boat technology as the starting point for a PWC off-throttle steering solution. [10]   *Of course* the jurors could question whether Breen's lucrative role as a product-liability defense expert might be at odds with the opinions he expressed in this case.[11]   *Each of these factors* provided the jury with at least some reason to question Breen's bias, credibility, and believability.  These factors presented a more than sufficient basis for the jury to find that Breen put his thumb on the scale in favor of BRP's preferred interpretation of the technological facts.   *See* Order on Motions to Strike and Summ. J. at 37, ECF No. 119 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.")).[12]

---

[9] *Cf.* Order on Motions to Strike and Summ. J. at 35-37, ECF No. 119 (discussing how the SAE study "casts further doubt on the so-called obviousness of Arctic Cat's patent claims" and concluding "[a]t the very least, these inconsistencies between expert statements present a credibility question for the jury.")  Regarding Breen's SAE conclusions, the Court also stated:  "The contrast between Mr. Breen's [1999] conclusions, which BRP has not been able to adequately explain, suggests that his 2016 statement may be influenced by hindsight . . . . Of course, the 'great challenge' of establishing obviousness is to proceed without 'any hint' of hindsight."  *Id.* at 36-37, (quoting *Star Scientific*, 655 F.3d at 1375).

[10] *See, e.g.,* Ex. 8 at 182:13-185:19 (testifying that he had analyzed the SAE testing and reports conducted by BRP's experts, and that in his opinion the SAE conclusions indicated that  Arctic Cat's patents were ***not*** obvious.)

[11] The Coast Guard expressed a concern to Breen as to how his report would impact product liability cases.  Ex. 6 at 89:20-90:7.

[12] The jury was also free to question how Breen could assert the obviousness of Arctic Cat's patent claims in light of BRP's jet boat without so much as bothering to inspect a physical jet boat during his work on this case.  Breen conceded that he had not inspected a jet boat, but was relying

### 4.    BRP Provides No Basis to Throw Out the Jury's Nonobviousness Verdict

During summary judgment, the Court addressed BRP's allegation that Arctic Cat's patents were invalid as obvious in view of BRP's jet boat patents and the Supreme Court's decision in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).  BRP's post-trial motion largely repackages these same arguments BRP made at summary judgment, and they are even less persuasive now on the basis of the evidence produced at trial.

Just as BRP failed to do at summary judgment, BRP still has not reconciled its invalidity arguments with the fundamental differences between Arctic Cat's patents and BRP's jet boat technology.  In its Order denying BRP's summary judgment motion, this Court found as follows:

> BRP fails to successfully refute Arctic Cat's argument that the steering technology disclosed in Rheault, a low-speed directional control system manually engaged by the driver, was fundamentally different than the OTS technology claimed in Arctic Cat's patents, which automatically engaged OTS.  Thus, even if it was clear to the Court that there was an understanding in 1999 of the applicability of OTS to PWCs, BRP has not proven that Rheault's docking assistance system would be no different from Arctic Cat's invented OTS system—regardless of whether it was installed on a jet boat or PWC.

Order on Motions to Strike and Summ. J. at 37, ECF No. 119.

BRP did not establish differently at trial.  While BRP's motion inaccurately represents that the jet boat "disclosed the claimed 'controlled thrust steering system' that 'activates said thrust mechanism to provide a steerable thrust after said lever is positioned other than to provide a steerable thrust and after the steering mechanism is positioned for turning the

---

on his memory of the Challenger, having previously owned a Challenger and tested it during the Coast Guard project in the late 1990s. Ex. 6 at 79:12-80:7.

005035-11 885484 V1

watercraft," Mot. at 5, this is not true as discussed above.[13]  The jet boat lacks several elements of Arctic Cat's patent claims.

BRP alleges that the Rheault '938 Canadian patent application describes the throttle reapplication system in BRP's jet boats.  Rheault '938 *describes itself* as a "Low Speed Steering System" to "enable the operator of the vehicle to manage docking and careful maneuvering of the watercraft vehicle." Ex. 20, Abstract.  Rheault emphasizes carburetor "biasing," *id.* at 5-6, and the explanation of its novelty over the prior art is as follows: "[N]one of the [prior art] patents disclose a means for controlling movement of the watercraft vehicle at low speeds by means of activating and controlling the carburetor and the air-fuel mixture being supplied to the carburetor." *Id.* at 4.

The jury could reasonably find that Rheault '938 (or BRP jet boat) does not disclose the type of controlled-thrust steering system disclosed in Arctic Cat's patents—i.e., a system intended for obstacle avoidance, including at higher speeds, and containing the components to accomplish as much (e.g., a biased throttle lever and steering mechanism with narrow turning range, allowing immediate activation of controlled thrust steering).  At trial, for

---

[13] BRP's motion jumps from a statement that the jet boat docking assist technology raised engine speed to 3,000 RPM to an assertion that such an RPM speed satisfies the requirement of "steerable thrust" in the '545 patent. Mot. at 5.  But the cited testimony from Breen fails to link, either implicitly or explicitly, the cited engine speed to the '545 patent claims' requirement of "steerable thrust." Ex. 5 at 262:25-264:8.  The jury was not required to draw inferences *in favor of BRP*. BRP failed to provide any testimony linking the jet boat docking assist RPM level to "steerable thrust" in personal watercraft and it was not the jury's job to fill in the holes in BRP's case.  *See Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1364 (Fed. Cir. 1998) (affirming willfulness despite opinion of obviousness; jury could have found opinion-of-counsel lacking because, inter alia, it does not link prior art disclosures to claim limitations), *overruled on other grounds by In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc); *see also Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (party asserting obviousness must show "that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention").

- 13 –

example, Dr. Cuzzillo explained how Rheault '938 and BRP's jet boats lack several limitations variously cited in Arctic Cat's asserted patent claims, including the "controlled thrust steering system," "steerable thrust," "steering mechanism," "throttle lever biased toward an idle position," "throttle body," or "magnet and a proximity switch rotationally independent of the magnet." Ex. 8 at 174:6-176:2.

Breen, too, admitted that the Rheault '938 does not disclose the "steering mechanism" as the Court construed that claim or a throttle lever biased toward an idle position. Ex. 6 at 75:19-76:3. Breen agreed that, as opposed to a PWC with a throttle biased to idle in a way in which letting go of the throttle will allow the PWC to go to idle, in the Rheault jet boat, a rider has to manually shift to get to idle. *Id.* at 77:6-10. Breen also agreed that the Rheault patent does not disclose a throttle body or a magnet with a proximity switch rotationally independent of the magnet. *Id.* at 77:15-25.

At heart, BRP's Motion largely boils down to the presumption that one of ordinary skill in the art would have been motivated to combine BRP's jet boat[14] with BRP's PWC because they were both jet-propelled watercraft, and could allegedly be combined with minimal effort to arrive at the invention disclosed in Arctic Cat's patents. BRP did not

---

[14] BRP sometimes muddles the obviousness analysis by going back-and-forth between discussing its physical jet boats and the Rheault '938 as if they were part of a single prior art reference. Particularly for its arguments alleging a motivation to combine, BRP's brief often reads as if BRP is picking and choosing certain aspects of the Rheault patent (e.g., a statement claiming it is applicable to PWCs) with certain aspects of its jet boats (e.g., the public availability of the Challenger boat or its product literature) as if they were part of the same prior art reference. This is improper for an obviousness analysis.

prove this at trial, nor did BRP show a justification for the alleged combination, and certainly not so clearly and convincingly that the jury was ***required to accept BRP's evidence***.[15]

### 5.      BRP's Other Arguments Fail to Support the Extraordinary Relief Requested in its Motion

#### a.      BRP's recycled 'objective reach of the claim' argument

Just as it did at summary judgment, BRP tries to recast the obviousness question as whether Arctic Cat's patent claims are "limited to high speed operation." Mot. at 12. But whether the claims are limited to a specific traveling speed is not the point. The point is that the different intended use of BRP's jet boat (low-speed steering) is reflected in the ***different properties of BRP's jet boat from Arctic Cat's patents*** as discussed above, as well as in whether one of ordinary skill in the art would be motivated to use BRP's jet boat technology as a starting point to come up with an off-throttle steering system for a PWC.

At trial, BRP's Richard Simard testified that just because something works on a jet boat, that doesn't mean it will work on a PWC. Ex. 4 at 68:18-19 ("[W]hat works on a jet boat may not work on a personal watercraft. That's what we found."). Breen did not dispute that testimony. Ex. 6 at 93:7-10. Breen testified that he was unaware of anywhere in the Challenger documents that he reviewed where BRP promoted its technology for an open-water obstacle avoidance situation. *Id.* at 79:7-11. The jury also heard from Dr. Cuzzillo, who testified that it would not have been obvious to combine BRP's jet boat

---

[15] BRP also incorrectly asserts that "[n]umerous other prior art references unequivocally confirm that one of skill in the art would be motivated to combine the Jet Boat's throttle reapplication system with PWCs," Mot. at 8, but fails to offer anything supporting this statement. The alleged "NASBLA Meeting" is not prior art, and as discussed above, the jury could reasonably conclude that Breen's 1999 recommendations to the Coast Guard contradicted his 2016 obviousness opinions. Regarding Boudriau '809, BRP does not explain any motivation argument and BRP did not assert the Boudriau '809 as an obviousness reference at trial.

technology with PWC elements such as handlebars and a throttle lever biased to idle.  *See* Ex. 8 at 176:3-178:2, 178:10-13.  Because of both (1) the low-speed nature taught by the jet boat technology; and (2) the missing elements from the invention claimed in Arctic Cat's patents, Dr. Cuzzillo disagreed that one of skill in the art would be motivated to combine BRP's jet boat technology with missing PWC elements.  *Id*.[16]  The jury heard nothing approaching clear and convincing evidence that Arctic Cat's patent claims "extend" to BRP's jet boat.

### b.      BRP's 'Proto-14' argument

The same holds true for BRP's "Proto-14."  *See* Mot. at 7.  The jury was free to weigh the evidence on Proto-14 and draw its own conclusions.  For example, the jury could have questioned the status of the prototype based upon the confidential Simard memo about Proto-14.  *See* Ex. 23. BRP's memo bizarrely stated that the prototype was "to react on recent Patented electronic device we heard about on TV."  *Id.* at BRP130982.  The memo ultimately identified Proto-14 as merely "interesting but not ready for production,"  *Id.* at BRP130983.[17]  The jury also heard testimony questioning whether "Proto-14" *negated* BRP's obviousness arguments.  *See* Ex. 8 at 187:23-188:7 (explaining that the abandoned prototype indicated that BRP had reached a "dead end" with any attempt to combine BRP's jet boat technology with a PWC).

---

[16] Dr. Cuzzillo also testified that he had heard nothing from BRP establishing that a person of ordinary skill in the art would have been motivated to combine BRP's jet boat technology with certain missing elements from the dependent patent claims, including a throttle body or a proximity switch with a magnet.  *Id.* at 178:3-9.

[17] Contrary to the assumption that BRP had produced a working prototype, Kevin Breen, BRP's technical expert, testified that although he was holding a spot open for BRP to submit another throttle reapplication device for his SAE testing for the U.S. Coast Guard, that BRP ultimately failed to provide any such device.  Ex. 6 at 81:12-17.

BRP's motion discusses Proto-14 as if it should be assumed that the confidential prototype read directly on Arctic Cat's patent claims and resulted in a working off-throttle steering system for a PWC. But BRP did not prove that at trial. And if the jury simply disagreed with BRP's witnesses about the significance of Proto-14 that does not mean the jury was wrong or unreasonable, as BRP seems to presume.

### c.    BRP's Non-Deference Argument

BRP's motion acknowledges that BRP's jet boat technology was already before the USPTO in the form of the Rheault '833 patent, which BRP concedes "address[ed] [BRP's] Jet Boat throttle reapplication technology." Mot. at 16. The jury was free to consider and draw inferences from the fact that the '545 and '969 patents issued despite the USPTO's review of BRP's jet boat patent.

BRP's apparent claim that the absence of "significant regulatory and market pressures to find solutions to off-throttle steering" is a reason to question deference to the USPTO is legally incorrect. Mot. at 17; *see* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd*, 564 U.S. 91, 108-110 (2011). Similarly, BRP's contention that the USPTO needed to see the "stipulations concerning prior art PWCs" in this case to understand the characteristics of PWCs makes no sense. Mot. at 17. When BRP refers to "Proto-14," the evidence at trial is conflicting as discussed above. In any case, BRP's contention that the failure of the USPTO's to review of BRP's ***confidential prototype*** provides grounds for ignoring the deference owed to the USPTO is simply wrong. The USPTO considered the far more relevant ***public '833 patent*** involving BRP's jet boat technology on a PWC, and found the claims patentable.

BRP's "critical evidence" and arguments against deference to the USPTO make little sense, and no difference in the outcome.  BRP had a full and fair opportunity to seek alterations to the jury instructions or make arguments to the jury about this suppose "critical evidence."  BRP has presented no reason for disregarding the jury's verdict.  *See Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260-61 (Fed. Cir. 2012) ("Importantly, whether a reference was before the PTO goes to the weight of the evidence, and the parties are of course free to, and generally do, make these arguments to the fact finder. But the presumption of validity and accompanying burden of proof, clear and convincing evidence, are not altered.").

### d.    BRP's Secondary Considerations Argument

BRP alleges that "[t]he evidence of secondary considerations presented at trial confirms the obviousness of the asserted claims."  Mot. at 9.  But there are no secondary considerations of obviousness.   Rather,   there   are   secondary   considerations   of *nonobviousness*—that a patent holder may use to support nonobviousness.

Here, it was not even necessary for the jury to consider secondary considerations of nonobviousness because BRP failed to provide clear and convincing evidence of obviousness in the first instance.  *Kinetic Concepts, Inc..*, 688 F.3d at 1360 ("At all times, the burden is on the defendant to establish by clear and convincing evidence that the patent is obvious.").  There was, however, evidence of secondary considerations presented at trial.

Arctic Cat's off-throttle steering solution for PWCs satisfied a "long-felt need"— namely, the off-throttle steering problem and the increasing number of PWC accidents. BRP defies credibility with its argument that before Arctic Cat's invention, BRP had already satisfied the long-felt need for a PWC off-throttle steering system with its jet boat

technology.  This assertion is directly refuted in Breen's SAE report (that documents Breen's jet boat testing) where he wrote that "an effort has been ongoing to develop this [off-throttle steering] technology for more than three decades with little commercially viable success." Ex. 13 at 23.  It was undisputed that **neither BRP nor anybody else had publicly demonstrated or sold a working throttle reapplication system for a PWC** before Arctic Cat's invention in 1999.  And regarding Arctic Cat's prototype (embodying the claimed technology), the Chief of the U.S. Coast Guard's Office of Boating Safety stated that it was "one of the most impressive innovations I've seen all year" (after riding Arctic Cat's prototypes).  Ex. 25 at 1.  That type of public praise further supports the jury's verdict of nonobviousness.  *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010).

### e.    BRP's Argument about "Potential Improvements" to the Hypothetical GTX-Jet Boat Combination

BRP claims that "Arctic Cat also argued at trial that it was not obvious to add the Jet Boat throttle reapplication system to PWCs because the SAE Reports and testimony about Proto-14 discussed potential ways of improving the GTX-Jet Boat combination that are not disclosed in the patents in suit."  Mot. at 13.  BRP gets the facts and the law wrong.

The reason that the lack of "smart controls" on BRP's jet boat and '938 application supports nonobviousness is because it teaches away from the introduction of the docking assist technology to a personal watercraft.  It has nothing to do with a reasonable expectation of success.  As noted above, the jet boat docking assist technology is designed for **low-speed, non-panic use.**  The fact that the technology cannot distinguish between panic and non-panic circumstances is a reason that **one of ordinary skill in art would not attempt to apply it to emergency obstacle avoidance situations in personal watercraft**

*in the first instance.* Ex. 5 at 235:15-236:5 ("And so that was kind of a concept there that both of those devices ***would be useful only if*** they were smart or on demand, as opposed to they just happened."). The Breen SAE report says as much, commenting only that the jet boat offered "interesting design features" but noting that "this technology has not been developed for off-throttle steering." Ex. 13 at 25. Whether the prior art teaches away from the claimed invention is a question of fact, and the jury is presumed to have made all factual findings in support of its nonobviousness verdict. *Allergan v. Sandoz, Inc.* 796 F.3d 1293, 1305 (Fed. Cir. 2015).

**B.**     **The Jury's Infringement Verdict is Well Founded and BRP's Claim that it is Entitled to Judgment as a Matter of Law or a New Trial is Meritless**

To prove infringement, a plaintiff must prove the presence of each and every claim element or its equivalent in the accused method or device. *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1301 (Fed. Cir. 2011). Infringement is a question of fact reviewed for substantial evidence. *Id.* (citing *Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323, 1332 (Fed. Cir. 2008)).

**1.**     **Reasonable and Logical Inferences Support the Jury's Verdict that BRP Directly Infringed the Asserted Method Claims**

Infringement of a method claim requires only a single act of infringement in the United States. *Mirror Worlds, LLC v. Apple Inc.,* 692 F.3d 1351, 1359 (Fed. Cir. 2012); *Lucent Techs, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1318 (Fed. Cir. 2009). And such an act may be proven by circumstantial evidence. *Id.; Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed. Cir. 1986). In this case, Arctic Cat presented evidence not only that each element of the asserted claims, including the asserted method claims, was "found" in the accused

products, Mot. at 18, but also that BRP tested the accused products in the United States—specifically for operation of the infringing off-throttle steering system.

The jury heard testimony that BRP maintains a testing facility for its personal watercraft products in Palm Bay Florida—in the United States.  Ex. 3 at 20:10-24 ("So this is the test center in Palm Bay, which is just up the coast from here…. here, we test the personal watercraft, the boats, ATVs").  The jury also heard testimony that BRP hires "test pilots" whose "specific job" is to test personal watercraft products at the Palm Bay facility. *Id.* at 24:9-12 ("the testing department was responsible for hiring the test pilots, so I forgot to mention that those that actually drive the boats are test pilots. That is their specific job.").  And Mr. Garcia testified that he personally tested BRP personal watercraft to understand how the BRP products were safe and complied with regulations.  *Id.* at 23:22-25 ("I myself tested most of the boats, if not all of the designs, in order that I could ensure that the safety was met, that the regulation was met").  Records documenting BRP's "standard OTAS Test" were admitted into evidence and Mr. Plante confirmed that the records represented real tests that were run within BRP to ensure compliance with the J2608 standard.  Ex. 16 at 1-2; Ex. 4 at 39:9-17.  The J2608 test requires that the rider release the throttle after passing a first set of buoys and then turn the handlebars to full lock within .25 seconds of passing a second set of buoys consistent with the required triggers events in claims 13 and 30 of the '545 patent. Ex. 10 at claims 13, 30; Ex. 18 at 4-5 (describing the "Test Procedure" in section 6).

In view of the documentary and testimonial evidence admitted at trial of extensive testing of BRP personal watercraft by both trial witnesses and BRP employed "test pilots," the inference that BRP performed the asserted method claims at least once at its Palm Bay

Florida testing facility in the United States was well supported by substantial evidence. *McGinnis,* 817 F.3d at 1254.

2. **The Jury's Verdict that OTAS Activates Immediately is Well Supported by the Evidence at Trial**

BRP's motion, for the first time in this case, seeks to modify the Court's construction of "after" and "upon" as "immediately" to fit its theory of the case.  This new quasi-claim construction argument—that "immediately" requires activation as soon as the handlebars begin to turn—is inconsistent with the claim language and the proper principles of claim construction.  Moreover, the jury's verdict that the BRP personal watercraft activate OTAS "immediately" is supported by substantial evidence.

a. **BRP Misapplies the Court's Claim Construction**

The patents' specification is clear that the controlled thrust steering system need not activate until the throttle lever is release ***and the handlebars are turned sufficiently far that a stationary proximity switch detects a magnet mounted on the steering column***. '545 Patent, Fig. 13, '969 Patent, Fig. 13.  BRP's own expert agreed that the embodiment disclosed in Figure 13 operates in exactly that manner.  Ex. 7 at 86:23-88:11.  That the specification expressly includes an embodiment that operates directly at odds with BRP's quasi-claim construction assertion that activation must occur as soon as the handlebars begin to turn is strong support for the jury's verdict.  This is particularly true as both claim 15 and the '969 patent and claim 15 of the '545 patent have dependent claims that disclose just such a magnet and a proximity switch allowing one of skill in the art to select the activation angle. Claim 17 of '969 patent; claim 25 of the '545 patent.

- 22 –

The asserted independent claims, claim 15 of the '545 patent, for example, requires that thrust be applied "after" the throttle is released and "after" the handlebars are positioned for turning.  The use of the language "positioned for turning" is properly interpreted as a particular activation angle, it is not necessarily the beginning of the turn. BRP's own witness Mr. Garcia confirmed that the handlebars of a BRP personal watercraft are "positioned for turning" when they are turned to the "full turning position."  Ex. 3 at 84:20-85:1.  The plain claim language is consistent with the jury's verdict of infringement.

Similarly, claim 15 of the '969 patent states:

> Said controlled thrust steering system causes said thrust mechanism to increase thrust upon said steering mechanism rotating from said generally straight-ahead position to **one of said clockwise position and said counter-clockwise position**, said controlled thrust steering system causes said thrust mechanism to decrease thrust upon said steering mechanism rotating from one of said clockwise position and counter-clockwise position **to said generally straight-ahead position**.

Ex. 11 at claim 15.  In this claim language, it is not the beginning of the rotation, but rather the **arrival** at "one of" a clockwise or counter-clockwise "position" that activates the system.[18]

Finally, the Court's claim construction order expressly rejected BRP's claim construction argument that "after" and "upon" required activation "every time" the handlebars are "positioned for turning" or "rotating from said generally straight-ahead position."  ECF No. 56 at 16-19.  Dr. Cuzzillo confirmed his opinion testimony that because

---

[18] The language of certain **unasserted claims** in the '969 patent illustrates the difference.  In unasserted claim 1 of the '969 patent, thrust increases "upon rotating said steering mechanism **in one of said clockwise direction** and said counter-clockwise direction" and thrust decreases "upon rotating said steering mechanism **toward** said straight-ahead position."  *Id.* at claim 1.

- 23 –

the controlled thrust steering system need not activate every time, that it makes no sense to require activation every time the handlebars are turned, no matter how little   Ex. 8 at 149:12-18 (**Q.** Dr. Cuzzillo, does "immediately" mean that OTAS activates any time you turn the handlebar a little bit for any reason?  **A.** No.").  BRP's attempt to modify the Court's construction of "after" and "upon" to require activation of a controlled thrust steering system as soon as the handlebars begin turning is unsupported.

> **b.     The Jury's Verdict that BRP's OTAS System Activates Immediately is Supported**

As discussed by Mr. Bernier in the context of the prototypes that he built, activation occurs immediately, but that "immediately is in the real world."  Ex. 1 at 76:4.  And as stated in the patents themselves, real world constraints such as mechanical and electrical systems may lead to "time lag."  Ex. 10, Col. 9:42-47.  Dr. Cuzzillo opined, consistent with Mr. Bernier and the patents' specification, that the Court's construction of "after" and "upon" as immediately should be understood, as a factual matter, as "on the time scale of the event."  Ex. 8 at 148:5-11.  Dr. Cuzzillo further opined that based of his attendance throughout the trial and observation of the live testimony of numerous witnesses that in the context of "initiating the mechanical actions" claimed in the patents, the quarter second "or often faster" for the handlebars of a personal watercraft to be turned to the full lock position, does not alter his opinion that OTAS activates "immediately."  *Id.* at 149:2-11.  That activation occurs in a fraction of a second was further supported by the J2608 standard and the testing performed by Mr. Simard on the OTAS activation angles showing a narrow range to the

steering lock position.[19]  Ex. 18 at 4-5 (describing the "Test Procedure" in section 6); Ex. 17 (showing detection angles for BRP personal watercraft).  The jury's verdict that OTAS activates "immediately" is well supported.

### 3. The Court's Construction of Controlled Thrust Steering System is Properly Not Limited to a Single RPM Level

BRP continues its fanciful quest to limit the Court's construction of controlled thrust steering system to a single RPM level or engine speed.  While it is certainly true that BRP OTAS-equipped personal watercraft include "multiple levels of thrust," that is the case with the watercraft claimed in the Arctic Cat '969 and '545 patents as well as the prototypes built by Fred Bernier.  As BRP's own expert witness, Mr. Taylor confirmed, "thrust" is a function of two things: (1) the mass of water that flows through the jet propulsion unit; and (2) the acceleration imparted to the water by the impeller.  Ex. 7 at 68:15-69:5.  Because personal watercraft have a direct drive, the engine speed (RPM) determines the impeller speed and the acceleration imparted to the water.  *Id.* at 69:23-70:5.  But the engine speed only determines the acceleration imparted to the water.  The surface speed of the personal watercraft forces water into the intake grate at the bottom of the personal watercraft.  *Id.* at 70:5-73:16.  When engine speed and the travelling speed are out of equilibrium, excess water will be forced through the intake grate ***and will necessarily generate more thrust as higher speed.***  *Id.* Fred Bernier testified exactly in accord:

> **Q.** Why is it that you can achieve controlled-thrust steering by a single RPM level?

---

[19] The tests performed by Dr. Cuzzillo and Mr. Kamen likewise demonstrated to the jury how quickly the throttle lever snaps to the idle position, the handlebars are turned to the full-lock position, and the OTAS-equipped personal watercraft generates thrust.  Ex. 19.

**A.** Simply because the efficiency of the boat traveling over the surface of the water. As it travels at a higher speed, there's an inlet grate on the bottom of the boat that draws water in. And then the pump essentially pushes it out the back of the boat. And when the boat is sitting still, for instance, at idle RPM, there's very little movement of water so you're relying only on the impeller pulling water in. ***But when the boat starts to move, it actually loads more efficiently, so it creates more thrust.*** What we found was a single RPM level on reapplied throttle creates the appropriate thrust to achieve the desired turn that we were looking for at 10 miles an hour, 20 miles an hour, 30 miles an hour. ***The same RPM, but by virtue of the fact that the boat is moving far more quickly across the surface of the water, it's able to generate enough thrust at each of those speeds***, even utilizing the same RPM.

Ex. 1 at 83:14-84:6. The Arctic Cat patents envision multiple levels of "thrust" even at a single engine speed.

BRP's noninfringement position depends on this Court changing the construction of controlled thrust steering system to limit the construction to a single engine speed or RPM level, which would be improper for at least two reasons. First, in an embodiment of a controlled thrust steering system disclosed in the patent specifications, off-throttle steering is achieved by dampening the ramp down of the engine RPM. Thus, as confirmed by Mr. Taylor, each RPM level will be hit ***during an activation of a controlled thrust steering system***. Ex. 7 at 75:1-76:22; Ex. 10, '545 patent at Col. 7:66-8:14 (describing the activation of the first through third embodiments of a controlled thrust steering system, which slow the throttle ramp down after throttle release). It would be error as a matter of law to construe a controlled thrust steering system to require a single RPM level, when there are embodiments of a controlled thrust steering system that do not rely on a single RPM level. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (noting that a construction

005035-11 885484 V1

that excludes the preferred embodiment is "rarely, if ever, correct").  Second, the patent specification specifically recognizes that ***thrust will vary*** with personal watercraft speed even during an activation relying on a single engine speed or RPM level.  Ex. 10, '545 patent, Col. 9, l. 37-39 ("Due to the nature of an engine powering a jet propulsion, variance in thrust and a small amount of thrust drop-off during the time period from $t_{12}$ to $t_{14}$ can be expected.").  The Court's construction of controlled thrust steering system was agreed to by BRP, is correct, and BRP's request that it be modified to require a single RPM level is meritless.[20]

### 4.   BRP's Assertion that the Proximity Switch and Magnets are Not Rotationally Independent in the Accused Sea-Doo PWC is Frivolous

Dr. Cuzzillo testified at length that the accused BRP Sea-Doo personal watercraft infringe claim 17 ('969 patent) and claim 25 ('545 patent).  Ex. 1 at 245:9-248:5 (Claim 25 of the '545 patent); *Id.* at 253:11-254:6 (Claim 17 of the '969 patent).  Yet, BRP continues to argue that claim 17 ('969 patent) and claim 25 ('545 patent) require the proximity switch to rotate to stationary magnets.  Mot. at 23; *cf* Ex. 7 at 35:6-22.  The sole basis on which BRP basis this argument is its bald assertion that if the magnets move toward a stationary proximity switch it would render "claim language redundant.  Mot. at 23.  BRP does not

---

[20] BRP's backup assertion that multiple RPM levels is not enabled by the specification of the '545 and '969 patents is likewise meritless.  One of skill in the art would understand that RPM could be optimized based on various other factors, through inclusion of, for example, a speed sensor and microprocessor, which Fred Bernier testified that he investigated as part of his development efforts. Ex. 14; Ex. 1 86:7-87:4.  Mr. Breen's conclusory testimony fails to identify what type of experimentation would be necessary, how much experimentation would be required, or why such experimentation would be "undue."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988) (identifying eight factors that guide the analysis of undue experimentation).  BRP failed to introduce any evidence relating to the eight *Wands* factors.  There is no evidence that undue experimentation (or even any experimentation) would be necessary to build a multiple RPM OTAS system based on the disclosure in the '545 and '969 patents—and certainly not by the required clear and convincing evidence. *Cephalon, Inc. v. Watson Pharms. Inc.*, 707 F.3d 1330, 1338-40 (Fed. Cir. 2013).

identify the allegedly redundant claim language in its memorandum, nor could it, because BRP's argument is meritless.

BRP's claim construction theory is flatly contradicted by the specification, including Figure 13 of the '545 and '969 patents, which show that the *magnets rotate toward a stationary proximity switch.*  Ex. 10 at Fig. 13; Ex. 7 at 76:23-79:8.  Notwithstanding Mr. Taylor's (and apparently BRP's) view that the specification is "kind of filler" that can be disregarded, the principles of claim construction are directly to the contrary.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("the specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" (citations omitted)).  BRP's position is meritless and the jury had little trouble reaching that proper conclusion that BRP's Sea-Doo personal watercraft infringe claim 17 ('969 patent) and claim 25 ('545 patent).

### C.   The Jury's Verdict that the Arctic Cat Claims were Willfully Infringed is Well Supported

BRP's motion to set aside the jury's willfulness verdict, or alternatively grant judgment as a matter of law of no willful infringement, is misplaced and should be denied.  First, *Halo* does not require willfulness to be found by the court, rather than the jury.  The same argument made by BRP has already been soundly and squarely rejected by another federal district court.  Second, the jury was properly instructed on the question of subjective willfulness, which is precisely what *Halo* upholds as the proper willfulness standard.  Third, as the Court already explained in detail in its Order Denying Judgment as a Matter of Law, there is more than adequate evidence from which a reasonable jury could find willful infringement, and the jury properly did so—even under the clear and convincing standard.

*See* ECF No. 148 at 5-10.  Finally, as to enhancement, BRP's statement that enhancement applies only to a "wanton and malicious pirate" and not to an infringer who "knew about the patent and *nothing more*" (emphasis in BRP's brief) grossly mischaracterizes both *Halo* and BRP's behavior.   BRP's motion for JMOL on willfulness and enhancement should be denied.

### 1.    *Halo* does not remove willfulness from the province of the jury

Under *Seagate* and before *Halo*, "objective willfulness" was a question for the Court, "subjective willfulness" was a question for the jury, and the ultimate question of enhanced damages under 35 U.S.C. § 284 was committed to the sound discretion of the district court based on a finding of, *inter alia*, willful infringement.  *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.,* 682 F.3d 1003, 1007-08 (Fed. Cir. 2012) (noting that subjective willfulness is decided by the jury, with objective recklessness/willfulness decided by the court); *Halo Elecs., Inc. v. Pulse Elecs., Inc.,* No. 14-1513, 2016 WL 3221515, at *5 (U.S. June 13, 2016).  Of those, *Halo* removed only the "objective recklessness/willfulness" prong from the enhanced damages analysis; now, under *Halo*, "[t]he subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless."  *Halo,* 2016 WL 3221515 at *8.

Contrary to BRP's position, *Halo* does not hold that the finding of subjective willfulness should now be made by the Court.  A least one other district court has rejected BRP's argument:

> [It] is correct that in *Halo*, the Supreme Court held that the
> ultimate decision of whether to award enhanced damages and in
> what amount is committed to the sound discretion of the trial
> court.  But there is no language in *Halo* holding that a finding as

to whether the infringement was willful must be made by the Court. Nor is there any language in the *Halo* decision holding that a jury may not make a finding as to subjective willfulness. Indeed, the Federal Circuit has historically held that a finding of willfulness is a question of fact. The Federal Circuit has further held that only the determination of whether the infringement was objective *[sic]* reckless is a question of law to be decided by the Courts. And a determination as to objective recklessness is no longer a prerequisite for an award of enhanced damages. Accordingly, the Court properly permitted the jury to issue a finding as to whether ATC's infringement was willful and the jury's finding as to this issue is not void.

*Presidio Components, Inc. v. Am. Tech.Ceramics Corp.*, No. 14-cv-02061-H-BGS, 2016 U.S. Dist. LEXIS 82532, at *44-45 (S.D. Cal. June 17, 2016) (internal citations omitted).[21] For the same reasons stated in *Presidio*, BRP's argument should be rejected. *See also PPC Broadband, Inc. v. Corning Optical Commc'n RF, LLC*, 2016 WL 3365437, at *5-6, *10 (N.D.N.Y. June 16, 2016) (citing Supreme Court decision in *Halo* and denying JMOL regarding willfulness).

## 2.    *Halo* does not impact the validity of the jury verdict

BRP argues that the jury's verdict cannot stand because it was instructed to apply the *Seagate* standard that the Supreme Court has since overturned. BRP's argument is disingenuous and should be rejected. The jury instruction on willful infringement pertained to BRP's *subjective* willfulness, which has not changed under *Halo*. *See* Ex. 9 at 44:16-45:18 (jury instruction); *Halo,* 2016 WL 3221515 at * 8 (holding, "The subjective willfulness of a

---

[21] BRP's contention that *Presidio* is "wrongly decided," Mot. at 24, n.7, is based on a tortured reading of *Halo*. BRP's references to the court's considerations for enhancing damages are from a discussion in *Halo* regarding the ultimate, discretionary issue of enhancement – not the fact question of willfulness. *See Halo,* 2016 WL 3221515 at *9 ("Yet none of this is to say that enhanced damages *must follow a finding of egregious misconduct [i.e., willfulness]*. As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award [enhanced] damages, and in what amount. Section 284 permits district courts to exercise their discretion in a manner free from the inelastic constraints of the Seagate test" (emphasis added)).

patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless").

BRP does not and cannot explain how *Halo* impacts the instruction given to the jury on willful infringement or why—under *Halo*—anything in the instruction is incorrect.  As is clear from the instruction, and as this Court has already explained:

> Any consideration of the *Seagate* test was limited to the Court's Order denying judgment as a matter of law, and oral argument on the same – and did not affect any other aspect of the trial in this case . . . .  Th[e *Halo*] decision, importantly, does not impact the validity of the instant judgment.  Certainly, where both objective and subjective willfulness were found by clear and convincing evidence, a more lenient inquiry as to subjective willfulness, without the additional hurdle imposed by the objective willfulness analysis, and by the lesser preponderance of the evidence standard, would reach the same result.

Final J. at 2-3, ECF No. 157.  BRP's motion, **which never even discusses the Court's analysis of this point from the Final Judgment**, should be denied.

> ### 3.   Contrary to BRP's assertions, the record contains abundant evidence from which a jury could reasonably find willful infringement

As detailed in previous briefing and this Court's Order Denying Judgment as a Matter of Law, ECF No. 148, the trial evidence clearly and convincingly established that BRP knowingly and willfully infringed the claims of the '545 and '969 patents.  Specifically, the trial testimony established that BRP knew of both the '545 and '969 patents almost immediately from the time they issued, but failed to properly investigate the scope of the patents and form a good-faith belief that the patents were invalid and/or not infringed.  *See* Order Den. JMOL at 5-10, ECF No. 148; Jury Verdict, ECF No. 153; s*ee also, e.g.*, Ex. 2 at 46:6-17 (J. Daunais testifying that defendants knew of the '545 and '969 patents each within

about a month after they issued); Ex. 5 at 45:15- 46:9 (D. Goudreault, the in-house patent agent who "investigated" the patents acknowledging that, by law, he is not permitted to give an opinion on patent infringement or validity); Ex. 24 at BRP133512 & 514 (reflecting BRP's cursory analysis of '545 and '969 patents); Ex. 5 at 53:8-54:21, 59:4-21, 67:20-68:9 (acknowledging that the art on which BRP relied was cited on the face of the '969 and '545 patents); Exs. 21, 22 (legal opinion letters not obtained until seven years and eleven years after first infringement); Ex. 2 at 47:5-12, 97:4-9, 102:15-17 (BRP retained lawyer R. Laurie to try to buy the '545 and '969 patents surreptitiously "just hoping that [Arctic Cat] didn't care about the patents anymore").

This and various other evidence contradicts and/or otherwise illuminates the assertion in BRP's brief that, "as soon as BRP became aware of Arctic Cat's prototype and patent application disclosing the accused OTS technology, BRP had a good faith belief that Arctic Cat's OTS patents were invalid based on BRP's jet boat prior art technology, and BRP notified Arctic Cat of that belief." Mot. at 25. In fact, no patent had issued at the time that BRP first became aware of the Arctic Cat prototype, so there were no patent claims from which BRP could form a "good faith belief that Arctic Cat's OTS patents were invalid[.]" *See, e.g., Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001); *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 942 (Fed. Cir. 1992) (validity is determined on a claim-by-claim basis); Ex. 5 at 52:24-53:7 (acknowledging that validity and infringement must be analyzed with regard to a particular claim from a particular patent). Moreover, with regard to what BRP *did* consider, BRP's Director of Engineering, Renald Plante, testified that Mr. Garcia returned from the demonstration of Arctic Cat's off-throttle steering

technology and told him that Arctic Cat's prototypes "worked well, but on my side, you know, we -- or rather, I compared the system that we were developing, the OPAS system that we were developing, to the Arctic Cat system and we decided to keep our OPAS [off-power] system and just stop the negotiations with Arctic Cat". Ex. 1 at 189:9- 190:15. The notes cited by BRP confirm Mr. Plante's testimony: "Discussed system—both drove it—Jean felt it worked OK but he also felt he wanted a system that worked when engine was off due to no fuel or failure." Ex. 15 at AC00008617. Also, as the notes from the meeting reflect, Fernando Garcia did not assert that any patents were invalid, but instead "***asked about our patent and how it would differ*** from [BRP's] jetboat system." *Id.* Arctic Cat "said [that the] Patent Office would decide." *Id.* And the Patent Office did decide—when it issued the claims of the '969 and '545 patents with undisputed knowledge of the '833 Rheault patent (one of the patents on BRP's jet boat technology) which was cited on the face of the '545 and '969 patents.

BRP's in-house patent agent, Dominic Goudreault, reviewed the '969 patent and the application for the '545 patent in 2004 when BRP was about to launch its 3D personal watercraft with infringing OTAS system. Even in his very cursory and conclusory notes, Mr. Goudreault indicated that the fact that the '833 patent was cited on the face of the Arctic Cat '969 necessitated "further review of file wrapper." *See* BRP Ex. 24 at BRP 133514. But no further analysis of the '969 patent is noted, and Mr. Goudreault admits that he never even reviewed the issued claims of the '545 patent. Ex. 5 at 62:16-64:11 (BRP patent agent Goudreault admitting that he reviewed the five claims of the published application for the '545 patent, but not the 31 claims that ultimately issued).

BRP attempts to rely on Jonathon Cutler, who BRP says "thoroughly [reviewed]" Goudreault's "analysis" of the '545 and '969 patents and "ultimately determined that Arctic Cat's patents were invalid." Mot. at 26. Mr. Cutler, however, did not testify in this case—despite the fact that he is still working as a patent attorney and, in fact, is a partner with Mr. Goudreault in their current patent firm. *See* Ex. 4 at 98:21-99:1; Ex. 5 at 48:8-15, 69:21-70:3. There is no evidence that anyone in authority formed any "good faith belief that Arctic Cat's OTS patents were invalid based on BRP's jet boat prior art technology" on BRP's behalf. Mot. at 25. BRP plotted and pursued its course for **seven years** before even looking at the issued claims of the '545 patent and **eleven years** before obtaining an opinion letter regarding the '969 patent.

BRP states that its reason for offering to purchase the Arctic Cat watercraft patents was <u>not</u> because it was concerned about liability, but merely to avoid the risk of retaliatory litigation when BRP sued Arctic Cat for alleged infringement of BRP snowmobile patents. But the jury was not required to accept BRP's self-serving characterization of its conduct. The very people tasked with avoiding liability on behalf of BRP—Yves St. Arnaud and Jean Daunais—were the same ones who devised the plan to purchase Arctic Cat's watercraft patents by stealth. Ex. 2 at 95:19-15. BRP did not offer to buy Arctic Cat's snowmobile patents, however; nor did it offer to buy Arctic Cat's ATV patents, engine patents, or patents in any other area where the two companies compete. *Id.* at 96:1-97:14. As BRP's Jean Daunais testified, BRP did not try to buy any of those other patents because BRP didn't think it infringed those patents, unlike Arctic Cat's watercraft patents:

> **Q.** And the reason you didn't try to buy any of those patents is because you didn't think BRP infringed those patents, right?

**A.** Well, that's difficult to say. I would say yes.

**Q.** Okay. But you did try to buy Arctic Cat's watercraft patents?

**A.** Correct.

*Id.* at 97:4-9.

BRP states that it never attempted to hide its development of OTAS.  But BRP knew that it had told Arctic Cat that it was pursuing an off-power option.  *See, e.g.*, Ex. 15 at AC 00008617.  BRP in fact implemented an off-power option for several years and—when it decided to implement OTAS—it never told Arctic Cat of the change.  BRP never approached Arctic Cat to seek a license or Arctic Cat's agreement that BRP's technology was non-infringing.  A reasonable jury could construe any or all of this information (as well as BRP's decision to secretly try to buy the patents) as clear and convincing evidence of willful infringement—as the jury in this case did.  Under the current standard requiring only a preponderance of the evidence, BRP's Motion for JMOL or a new trial should be denied.

### 4.    The Court properly exercised its discretion to enhance damages

Section 284 of the Patent Act "allows district courts to punish the full range of culpable behavior" associated with willful infringement – not just the "wanton and malicious pirate" (which Halo describes as "the most culpable offenders").  *Halo*, 2016 WL 3221515, at *4, 7-9.  In this case, BRP's willful, culpable, and egregious conduct has been detailed in a number of documents, including the Court's Order Denying Judgment as a Matter of Law, ECF No. 148; the Final Judgment, ECF No. 157; Arctic Cat's Motion for (a) Accounting of Supplemental Damages; (b) Post Judgment Ongoing Royalty; and (c) Period Accounting through Expiration of the '545 Patent-in-Suit, ECF No. 160; and Arctic Cat's Opposition to BRP's Motion to Vacate Judgment, ECF No. 170.  This Court has also noted the [non]

"closeness of the case"—particularly under the current preponderance-of-the-evidence standard—as the jury found clear and convincing evidence of BRP's willful misconduct. *See* Final J. at 2, ECF No. 157. Those factors alone authorize the Court to enhance damages against BRP as the Court assesses "the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992). Add to that the evidence of: (a) BRP's size and financial condition; (b) the duration of the misconduct and lack of remedial activity; and (c) BRP's litigation conduct, and the evidence overwhelmingly supports the Court's enhancement of damages. See Pl.'s Opp'n to Def.'s Mot. to Vacate Enhancement at 9-15, ECF No. 170 (discussing application of the *Read v. Portec* factors to the facts of this case). The Court's decision to treble damages in this case is well supported by the record and BRP's Motion for Judgment as a Matter of Law should be denied.

**D. The Jury's Damages Award was Based on Permissible Evidence and Testimony Directly Tied to the Facts of this Case**

Damages were assessed at a per unit reasonable royalty rate ($102.54), 35 U.S.C. § 284, which rate was determined by analyzing a hypothetical negotiation between the parties taking place at the time of first infringement. Ex. 2 at 119:6-171:2 (direct examination of Mr. Bratic). The negotiation is an artificial construct that "necessarily involves an element of approximation, and uncertainty." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857-58 (Fed. Cir. 2010) (affirming denial of new trial motion on $200 million reasonable royalty damages); *Carnegie Mellon Univ. v. Marvell Tech. Group. Ltd.*, 807 F.3d 1283, 1303-04 (Fed. Cir. 2015) (affirming reasonable royalty rate based on substantial evidence, including post-negotiation data regarding "significant . . . industry-wide" usage of invention). Arctic Cat's damages

expert, Mr. Bratic, evaluated the August 2004 hypothetical negotiation between the parties using a methodology that strictly adhered to Federal Circuit case law.

Mr. Bratic meticulously addressed all of the *Georgia-Pacific* factors, explaining in detail how the hypothetical (and willing) negotiators would have considered each factor.  Ex. 2 at 137:19-164:13.  For example, Mr. Bratic found that BRP owned a patent covering OTS technology that was comparable (although technologically inferior) to Arctic Cat's patents-in-suit.  *Id.* at 150:5-152:2.  BRP offered to license its OTS patent to Kawasaki (in the real-world) for $100 per PWC—and this offer occurred in August 2004, the very same month as the hypothetical negotiation.  *Id.* at 151:5-23.  This highly relevant *pre*-negotiation data point directly refutes BRP's claim that OTAS only had a $3 profit margin and that it would never have agreed to Mr. Bratic's hypothetical $102.54 royalty rate.  Mot. at 29.  Mr. Bratic considered many other pre-negotiation data points, including Arctic Cat's 2002 license to Honda (of its earlier OTS patents), *id.* at 144-23-147:1, the growing demand for OTS capabilities in PWCs from 1998-2003, *id.* at 155:16-156:14, the parties' market positions in August 2004, *id.* at 161:13-162:5, and the parties' relevant bargaining positions in August 2004 (based on numerous factors related to the patents, technology, attributable revenue, and design arounds), *id.* at 163:5-165:5.

In addition to these pre-negotiation data points, Mr. Bratic also used the "book of wisdom"—as allowed by Federal Circuit law—to consider the highly relevant post-negotiation data point of financial data related to BRP's iBR brake system.  *Id.* at 159:2-161:12.  As discussed in more detail below, Mr. Bratic relied on this information based on Dr. Cuzzillo's opinion that the two technologies were at least "comparable in terms of

technological importance because they both relate to safety . . . ." *Id.* at 159:7-13.  Thus, Mr. Bratic's methodology was sound, proper, and a "reasonable approximation" of the August 2004 hypothetical negotiation between Arctic Cat and BRP.  *Carnegie*, 807 F.3d at 1304 (noting that "reconstruction of the hypothetical [negotiation] . . . does not require 'mathematical exactness,' but a 'reasonable approximation' under the circumstances," citing *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 647 (1915)).

Nonetheless, BRP argues that the jury's reasonable royalty finding should be disregarded for two reasons: (1) Mr. Bratic considered post-negotiation 2012-13 financial data related to the iBR brake system; and (2) Mr. Bratic drew a comparison between the infringing OTAS system and BRP's iBR brake system.  Neither is well founded.

### 1. Mr. Bratic's Reliance on Information Post-Dating the Hypothetical Negotiation was Reasonable and Appropriate

To the extent Mr. Bratic relied on post-negotiation data points, he did so pursuant to the Federal Circuit's "book of wisdom."  *See Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (en banc).  The book of wisdom "permits and often requires a court to look to events and facts that occurred [after infringement] that could not have been known to or predicted by the hypothesized negotiators."  *Id.* at 1575.  Using the book of wisdom "[t]o correct uncertain prophecies [does not] charge the offender with elements of value non-existent at the time of his offense, . . . [instead it] bring[s] out and expose[s] to light the elements of value that were there from the beginning."  *Id.* (quoting *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698-99 (1933)).  The doctrine is especially useful "where the subject of the bargain is an

undeveloped patent." *Id.* (same).  The Federal Circuit has stated that "our case law affirms the availability of post-infringement evidence as probative in certain circumstances."  *Lucent Tech. Inc.*, 580 F.3d at 1333 (citing *Fromson*, 853 F.2d at 1575); accord *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257 (Fed. Cir. 2005).

The book of wisdom affords an important flexibility to the hypothetical negotiation that helps discourage infringement.  Without it, prospective infringers might rationally conclude that, at worst, a license will be compelled at the same royalty that would have been paid if the patentee's rights had been respected at the outset.  *Fromson*, 853 F.2d at 1574. The book of wisdom avoids the problem of determining a reasonable royalty at a point in time before the patent has proven its worth, ensuring that patentees will be adequately compensated and infringers will not receive a windfall from its infringement.  *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465 (D. Del. 2005) ("the 'book of wisdom' concept protects the quid pro quo arrangement underlying patent law by ensuring that the patentee will be adequately compensated for infringement"); *see also On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 409-10 (S.D.N.Y. 2015).[22]

Mr. Bratic did not provide an "after-the-fact-assessment" of OTAS's value.  He plainly focused his assessment on the valuation that willing negotiators would have given

---

[22] In its motion, BRP brushes the book of wisdom aside and speciously suggests that "the overwhelming weight of Federal Circuit case law" denies the use of post-negotiation information in the hypothetical analysis.  Mot. at 30 (citing *Riles, Hanson, Lucent,* and *Integra*).  Relying on *Riles*, BRP argues Mr. Bratic is making an "after-the-fact-assessment."  *Id.* (citing *Riles v. Shell Exploration & Products, Co.*, 298 F.3d 1302 (Fed. Cir. 2002)).  BRP neglects to mention that the quoted *Riles* clause has actually created an "apparent tension" regarding the use of post-negotiation data that has "generated significant confusion in the district courts."  *On Track Innovations Ltd.*, 106 F. Supp. 3d at 409-10, n.22.  In light of that tension, "most district courts conclude that they have the discretion, but not the obligation, to consider post-negotiation evidence in calculating a reasonable royalty."  *Id.*

OTAS in August 2004.  His consideration of post-negotiation data points (pursuant to the book of wisdom) does not change that fact.  And notably, most of BRP's own cases support the use of post-negotiation data points.  Mot. at 30.  For example, in *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983), the accused infringer successfully introduced post-negotiation data related to *actual* usage of the infringing snow makers (which was much lower than the *estimated* usage suggested by the patentee's expert).  *See Fromson*, 853 F.2d at 1576 n.13 (Fed. Cir. 1988) (citing and describing multiple Federal Circuit cases approving the use of post-negotiation data in the hypothetical negotiation).  And in *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), the Federal Circuit noted that "factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation."  *Id.* at 1333.  Indeed, "the hypothetical negotiation analysis 'permits and often requires a court to look to events and facts that occurred [post-infringement] and that could not have been known to or predicted by the hypothesized negotiators.'"  *Id.* (quoting *Fromson*, 853 F.2d at 1575).

BRP's continued reliance on *Riles* and *Integra* is misplaced.  In *Riles*, all three challenged damages models were based entirely on post-negotiation data that was not sufficiently tied to the patented technology.  *Id.* at 1312-13 ("[all three] models reflected Mr. Dry's assessment of the worth of Shell's oil rig at the time of trial . . . [the models did not] reflect[] what the parties might have agreed to, at any time, particularly at the time the infringement began.").  BRP also cites *Integra Lifesciences I, LTD. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003), despite the fact that this Court already found that case to be inapposite.  Order on Mot. to Strike and Summ. J. at 27, ECF No. 119.  Undeterred, BRP cites *Integra* in

arguing that "the Federal Circuit has made clear that subsequent [post-negotiation] events can only inform the hypothetical negotiation if they are **expected** by the parties at the time of first infringement."   Mot. at 31 (emphasis added, BRP further arguing that post-negotiation events are only allowed if they are **"known to or predicted by** the parties at the 2004 hypothetical negotiation").   This argument defies reason.   First, *Fromson* clearly rejects it.   853 F.2d at 1575 (noting that the book of wisdom allows for consideration of post-negotiation facts that "could not have been known to or predicted by the hypothesized negotiators").   And second, BRP plainly misinterprets *Integra*'s discussion of the "*expectation of obtaining FDA approval.*"   That "expectation" was offered as a *pre*-negotiation data point that would impact the hypothetical negotiation.   Moreover, neither *Riles* nor *Integra* so much as mention the book of wisdom.   BRP's running theme that the hypothetical negotiators had to "expect" or "predict" post-negotiation events is simply wrong.[23]

BRP's efforts to avoid and dismiss the book of wisdom are unavailing and plainly distort Federal Circuit and Supreme Court case law.   Mr. Bratic's consideration of post-negotiation data points, which are tied to the patented technology and focused on the August 2004 hypothetical negotiation date are proper, reasonable, and appropriate.

---

[23] BRP also misleadingly quotes a sentence from Mr. Bratic's testimony regarding the maxim "the hypothetical negotiation is an *open book,*" to suggest a misunderstanding of the book of wisdom. Ex. 2 at 141:15-142:7; Mot. at 30.  BRP's characterization is disingenuous at best as Mr. Bratic appropriately testified about the book of wisdom a few minutes later.  Ex. 2 at 142:17-23 ("The book of wisdom says that if you're looking at a hypothetical negotiation between Arctic Cat and BRP, in August of 2004, the parties are entitled to consider information that occurred after August 2004.").

### 2.    Mr. Bratic's Reliance on the iBR Brake as a Benchmark to Value BRP's OTAS Implementation of Arctic Cat's Patented Technology was Reasonable and Appropriate

BRP next argues that Mr. Bratic improperly compared the infringing OTAS system to BRP's iBR brake system. Mot. at 33-37. But in the context of the hypothetical negotiation analysis, the comparison was permissible, reasonable, and highly relevant. Ex. 2 at 159:2-161:12. Mr. Bratic was able to draw comparisons between the economic value of the two features by relying upon the opinions of both Dr. Cuzzillo and Dr. Kamen (regarding the technology comparability). *Id.* at 154:20-155:9, 156:17-157:7, 159:1-24, 162:9-14; *Id.* at 159:10-13. And Dr. Cuzzillo testified to that view at trial *Id.* at 8:8-10:4. Mr. Bratic relied on Dr. Cuzzillo's opinion that the integrated OTAS system and iBR braking system both provide very important safety features—for example, they both allow for physical maneuvering of the PWC to avoid collisions in emergency situations.[24]

Based on the comparability of these systems, Mr. Bratic was able to use the iBR braking system as a "proxy for the economic value of OTAS." *Id.* at 160:13-19. In other words, the iBR brake system provided a "benchmark" for Mr. Bratic's analysis of the August 2004 valuation of OTAS. And the benchmark was conservative.

As Mr. Levesque, BRP's Vice President of Global Marketing and Consumer Experience testified, both the iBR brake and OTAS are features of Sea-Doo PWC, but only OTAS is must be included in every PWC sold. Ex. 7 at 160:12-22. While the iBR brake is an optional feature that consumers may or may not choose to purchase, the value of OTAS

---

[24] Mr. Kamen also testified that "Well, iBR is primarily a brake; and OTAS, off-throttle assisted steering, is a steering device. I think we would all agree that for a road vehicle you need steering and you need a brake. And it would not -- the vehicle would not be safe if you omitted one or the other." Ex. 1 at 156:1-5.

is automatically included in the baseline price of the PWC. *Id.* at 159:14-160:25. And even if a consumer does not purchase the iBR brake feature, OTAS is still included in the PWC. Ex. 2 at 116:3-25. Thus, Mr. Bratic's use of the optional iBR brake system as a benchmark for the valuation of the essential OTAS system is necessarily conservative. Ex. 2 at 233:12-234:2.

BRP argues that the two systems (OTAS and iBR brake) are not sufficiently similar for Mr. Bratic to use the iBR brake system as a benchmark for OTAS. Mot. at 36. However, because this is a hypothetical negotiation, and OTAS is so essential to the PWC that its value is subsumed into the standard cost of the PWC, it is reasonable for Mr. Bratic to rely on the most similar feature for which there is an individual valuation. Ex. 2 at 159:25-160:12 (OTAS subsumed in baseline price, but iBR valuation broken out). Despite BRP's protestations that the iBR brake is not similar to OTAS, BRP failed to suggest any other feature (with an individual valuation) that might be a better comparison. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1319-20 (Fed. Cir. 2014) (reversing district court's exclusion of expert damages testimony and noting that the adversary "is free to challenge the benchmark or argue for a more accurate benchmark. But such an argument goes to evidentiary weight, not admissibility . . . ."). BRP proposed its alternative damages model, including its claim that the book of wisdom did not apply under these circumstances. But the expert testimony of both Dr. Cuzzillo and Mr. Kamen provided an admissible basis for Mr. Bratic's damages analysis.

BRP's cases on comparability are inapposite because the comparability requirements discussed in those cases relate to comparing prior existing *licenses*—which is not what

Mr. Bratic did here by using the iBR brake *product* as a benchmark for OTAS market value. Indeed, in reference to *Lucent*, 580 F.3d 1301 (Fed. Cir. 2009), the Federal Circuit noted that "this court just recently rejected a patentee's reliance on licenses because 'some of the license agreements [were] **radically different** from the hypothetical agreement under consideration….'" *ResQNet.com, Inc. v. Lansa, Inc*, 594 F.3d 860 (Fed. Cir. 2010) (emphasis added). And in *ResQNet.com* itself, the Federal Circuit rejected damages expert's reliance on "licenses" with no relationship to the claimed invention. *Id.* at 870. BRP's remaining cases are similarly inapposite. *See, e.g.*, *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("When relying on **licenses** to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211-12 (Fed. Cir. 2010) ("…past patent licenses under factors 1 and 2 must account for differences in the technologies and economic circumstances of the contracting parties."); *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385 (Fed. Cir. 2003) (discussing "the license agreements" used in its expert's analysis).

The jury's damages award was supported by the evidence and testimony at trial. Mr. Bratic properly relied on the *Georgia-Pacific* factors and analyzed both pre-negotiation and post-negotiation data points in his analysis, which is proper and permissible under the "book of wisdom." BRP's Motion for JMOL or a new trial should be denied.

**E.     The Jury's Finding of No Patented Articles to Mark (35 U.S.C. § 287) is Well Founded and BRP's Claim that it is Entitled to a Judgment as a Matter of Law or New Trial is Meritless**

A patentee has the burden to prove compliance with the marking and notice requirements of 35 U.S.C. § 287(a)—but that burden only arises when the statute is "triggered." *See, e.g., Fortinet, Inc. v. Sophos, Inc.*, No. 13-cv-05831-EMC, 2015 U.S. Dist. LEXIS 140048, at *16 (N.D. Cal. Oct. 14, 2015); *Golden Bridge Tech. Inc. v. Apple, Inc.*, No. 5:12-cv-04882-PSG, 2014 U.S. Dist. LEXIS 67238, at *34-35 (N.D. Cal. May 14, 2014); *Oracle Am., Inc. v. Google Inc.*, No. 10-03561-WHA, 2011 U.S. Dist. LEXIS 131707, at *10-11 (N.D. Cal. Nov. 15, 2011).  Section 287(a) is triggered when there is an apparatus claim ***and*** the patentee (or licensee) sells a product in the U.S. that practices the claimed invention ("patented articles").  *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996); *Am. Med. Sys. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537-39 (Fed. Cir. 1993), *cert. denied*, 1994 U.S. LEXIS 3360.

Application of 35 U.S.C. § 287(a) is a two-step process.  In the first step, BRP must establish that Arctic Cat, or its licensee, sold a "patented article."  BRP failed to adduce sufficient evidence to support that threshold question.  Jury Verdict at 4-5, ECF No. 153.  Undeterred, BRP now seeks (by way of this renewed JMOL) to disrupt the jury's finding. *See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, (Fed. Cir. 1996) (affirming district court's denial of infringer's JMOL that plaintiff did not comply with § 287; noting that "[c]ompliance with section 287(a) is a question of fact, and we review the court's denial of JMOL on the jury's resolution of the issue for substantial evidence").  BRP actively participated in, and approved

of the jury instruction and verdict form on this issue.  And the dearth of evidence (from

BRP) supports the jury's finding that Honda did not make a patented article.

### 1.  The Jury Was Properly Instructed on Marking & Notice (§ 287)

The jury was properly instructed as to the marking and notice requirement under 35

U.S.C. § 287(a).  The Jury Instruction ("Date Damages Begin") states:

> ***Arctic Cat must prove*** that it is more likely than not that BRP
> actually was notified of the claim for patent infringement as of
> the date alleged by Arctic Cat.
> ***
> If you find that Arctic Cat and its licensees did mark
> substantially all of their products with the patent number, then
> October 16, 2008 is the date for the start of damages
> calculations.  If, however, you find that Arctic Cat and its
> licensees did not mark substantially all of those products with
> the patent number, then Arctic Cat did not provide notice in
> this way.

ECF No. 151 at 31-32.

BRP initially proposed an additional concluding sentence to this paragraph imposing

the burden of showing no patented article on Arctic Cat.  Mot. at 44-45.  But BRP dropped

this request in a subsequent Joint Proposed Jury Instruction at 76, ECF No. 146.  BRP made

no objection to the omission of this sentence during the charging conference.  Ex. 9 at 14:6-

19:14 (objections to Court's draft jury instructions).  And BRP made no objection to the

Court including the question of whether Honda manufactured and sold a "patented article"

in the jury verdict form, and in fact argued for its inclusion.  *See Id.* at 8:14-9:21, 6:23-14:5

(generally discussing § 287 marking language on Court's draft verdict form).  ***Thus, BRP***

***waived any argument that the jury was not properly instructed on the requirements***

***of 35 U.S.C. § 287(a)).***  *Id.* at 19:13-14 (Ms. Rodman: "Your Honor, we don't see anything

– 46 –

else on our end…"); *Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1394 (11th Cir. 1997)

("Failure to object to the instructions on these grounds before the jury retired constituted a

waiver . . . .").

> **2.      Placing the Burden of Producing Adequate Evidence that Honda Sold a "Patented Article" on BRP was Proper**

It is undisputed that if § 287 is triggered, then the patentee has the burden of

persuading the fact-finder that it complied with the statute.  *See* Jury Instr. at 31-32, ECF

No. 151.  However, when the *existence* of a patented article is disputed—as it is here—"the

better view" among district courts (including this Court) is to place the initial burden of

*producing evidence of a "patented article"* on the accused infringer.  *See* Order on Mot. to Strike

and Summ. J. at 59, ECF No. 119 (citing *Sealant Sys. In'l, Inc. v. TEK Glob. S.R.L.*, No. 5:11-

CV-00774-PSG, 2014 U.S. Dist. LEXIS 31528, at *112-13 (N.D. Cal. Mar. 7, 2014), *rev'd in*

*part on other grounds*, 616 F. App'x 987 (Fed. Cir. 2015)); Order Den. JMOL 13, ECF No. 148.

When that initial burden is met, "then the burden of persuasion shall shift to [patentee] to

show that [the alleged patented] products do not practice the inventions claimed," *Fortinet,*

*Inc. v. Sophos, Inc.*, No. 13-cv-05831-EMC, 2015 U.S. Dist. LEXIS 140048, at *17 (N.D. Cal.

Oct. 14, 2015), or show that it made reasonably efforts to ensure substantial compliance with

§ 287(a).  *Maxwell*, 86 F.3d at 1111-12.

And like this Court, district court judges considering the issue are choosing to apply

*Sealant's* better view.  *See, e.g., Fortinet*, 2015 U.S. Dist. LEXIS 140048 at *17 (finding the

better view "persuasive [and thus] plac[ing] the [§ 287] burden of production on [accused

infringer] to identify [] products it believes practice the inventions claimed.  If [accused

infringer] meets that burden, then the burden of persuasion shall shift to [patentee] to show

that its products do not practice the inventions claimed."); *Golden Bridge Tech. Inc.*, No. 5:12-cv-04882-PSG, 2014 U.S. Dist. LEXIS 67238, at *35 (N.D. Cal. May 14, 2014) (placing the initial § 287 burden on accused infringer "remains the 'better view' because, absent guidance, the universe of unmarked, marketed goods with the potential to trigger Section 287 'would be unbounded.'").

By repeatedly focusing on § 287's full "burden of proof," BRP appears to misapprehend this Court's (and many other courts') better view on the proper presentation of evidence.  BRP was tasked with producing competent evidence as to whether one or more Honda PWCs were "patented articles."  *See Eurand, Inc. v. Mylan Pharms., Inc. (In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.)*, 676 F.3d 1063 (Fed. Cir. 2012) citing *Microsoft Corp. v. i4i Ltd.*, 131 S. Ct. 2238, 2242 (2011).  The question of whether BRP satisfied this initial burden of showing that Honda personal watercraft were a "patented article" was submitted to the jury in the special verdict form, not only without objection by BRP but over the objection of Arctic Cat.  Ex. 9 at 11:10-12:4.  This question was submitted to the jury, and the jury decided that Honda did not make any patented articles.  Jury Verdict at 4-5, ECF No. 153.

BRP cites cases that, at least in substance, follow the better view adopted by this Court.  For example, in *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prod., LLC*, 2013 U.S. Dist. LEXIS 61272 (M.D. Penn. April 30, 2013), the district court specifically found § 287 triggered because the accused infringer met its initial burden.  As the court explained "[Mr.] Goldman, [accused infringer] FQ's expert, **tested 14 packages of [licensee] P&G diapers** . . . none of which bore the [plaintiff KC's] Patent number, and Goldman concluded

that these products practiced at least claim 1 of the [KC's] Patent." *Id.* at *20 (emphasis added).  Here, BRP did not test any Honda products, did not admit any documentary or testimonial evidence from Honda, and relies exclusively on brief, conclusory, and confusing testimony from Mr. Taylor and Mr. Olds.

BRP's citation to *Adrea, LLC v. Barnes & Nobles, Inc.*, No. 13-cv-4137 (JSR), 2015 U.S. Dist. LEXIS 100312 (S.D.N.Y. July 23, 2015) highlights the problem with going against the better view.  In *Adrea*, patentee complained about the burden of proving that "none of Amazon's products practice the patents-in-suit," and defendant complained about the burden "to prove that Amazon's products practiced that patents-in-suit." *Id.* at *5-6.  The *Adrea* court sided with defendant, *id.* at *7, but the "better view" (adopted by this Court) only places the initial burden of showing that a "patented article" was sold on defendant, not the burden of proof of full compliance with the marking statute (as the *Adrea* court suggested). *Id.* at *6.  Particularly in situations where large companies, such as Honda, with numerous products may license technology whether or not they intend to use it, it makes far more sense to adopt the "better view" that an accused infringer must initially establish that "patented articles" were sold.

### 3. BRP Failed to Establish that Honda Practiced the Patents-in-Suit

Accepting that it has the initial burden of showing that "patented articles" were sold, BRP argues that its "undisputed evidence presented at trial" shows that Honda's PWCs are unmarked patented articles.  But the trial record shows otherwise.

The Court previously rejected Mr. Taylor's opinion (that Honda PWCs are patented articles) because his expert declaration "analysis [was] heavy on charts but light on analysis."

Order on Mot. to Strike and Summ. J. at 60-61, ECF No. 119. Mr. Taylor's trial testimony makes no effort to address the Court's pre-trial concerns regarding his lack of analysis. When asked if "the Honda Aquatrax PWC practiced the asserted claims," Mr. Taylor testified that, based on his analysis of the Honda PWC manuals, "[he] would have the opinion that [the Honda OTS system] do[es]n't infringe [sic] on the '545 and the '969 patent." Ex. 7 at 51:1-5, 51:20-52:1. But in that same breath, Mr. Taylor claimed that if BRP's OTAS infringes, then Honda's PWC must be a patented article because the "Honda system is very similar to OTAS." *Id.* This simplistic syllogism, unsupported by any documentary or testimonial evidence from Honda, fails to rise to the level of competent evidence or analysis.

And BRP's reference to Mr. Olds deposition testimony, Mot. at 44, is similarly lacking in any type of useful analysis. The jury was free to disregard BRP's conclusory trial testimony of Mr. Taylor and Mr. Olds and find, as they did, that 35 U.S.C. § 287(a) remained untriggered and inapplicable. The jury's finding that Honda made no patented articles (a question BRP sought to include in the verdict form) is proper in light of BRP's failure to provide competent evidence to the contrary. BRP's renewed JMOL should be denied. And BRP's motion for a new trial on the issue of marking should similarly be denied.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that BRP's motion for judgment as a matter of law or for a new trial be denied in its entirety.

Dated:  July 12, 2016          Respectfully submitted,

*s/ Lance A. Harke*
Lance A. Harke, P.A.
Florida Bar No. 863599
lharke@harkeclasby.com
Sarah Clasby Engel, P.A.
Florida Bar No. 991030
sengel@harkeclasby.com
Howard M. Bushman, P.A.
Florida Bar No. 0364230
hbushman@harkeclasby.com
**HARKE CLASBY & BUSHMAN LLP**
9699 NE Second Avenue
Miami Shores, Florida 33138
Telephone:     (305) 536-8220
Telecopier:     (305) 536-8229

Steve W. Berman (*pro hac vice*)
Nicholas S. Boebel (*pro hac vice*)
**HAGENS BERMAN SOBOL**
**  SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 268-9320

Aaron A. Myers (*pro hac vice*)
Niall A. MacLeod (*pro hac vice*)
Diane L. Peterson (*pro hac vice*)
**Kutak Rock LLP**
220 South Sixth Street, Suite 1750
Minneapolis, MN 55402
Telephone: (612) 334-5000

*Attorneys for Plaintiff Arctic Cat Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2016, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF, which will send notification of such filing to all counsel of record on the Service List below.

s/*Lance A. Harke*

## SERVICE LIST

Scott M. Sarason (Florida Bar No. 0394718)
ssarason@rumberger.com
Michael R. Holt (Florida Bar No. 0483450)
mholt@rumberger.com
Rumberger Kirk & Caldwell
A Professional Association
Brickell City Tower, Suite 3000
80 Southwest 8th Street
Miami, FL 33130-3037
Telephone: (305) 358-5577

Rachael L. Rodman
Rachael.rodman@dinsmore.com
John D. Luken (Admitted *Pro hac vice*)
john.luken@dinsmore.com
Joshua A. Lorentz (Admitted *Pro hac vice*)
joshua.lorentz@dinsmore.com
Lauren E. Ingebritson (Admitted *Pro hac vice*)
lauren.ingebritson@dinsmore.com
DINSMORE & SHOHL LLP
1900 First Financial Center
255 East Fifth Street
Cincinnati, OH 45202
Telephone: (513) 977-8200

Jason M. Wejnert (Admitted *Pro hac vice*)
jason.wejnert@dinsmore.com
DINSMORE & SHOHL LLP
227 W. Monroe Street
Suite 3850
Chicago, IL 60606
Telephone: (312) 428-2730